Pages 1 - 57

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

ROBERT BOSCH HEALTHCARE,      )
SYSTEMS, INC.                 )
                              )
          Plaintiff,          )
                              )
  VS.                         ) No. C 14-1575 EMC
                              )
CARDIOCOM, LLC and ABBOTT     )
DIABETES CARE, INC.,          )
                              ) San Francisco, California
          Defendants.         ) Thursday
_____) May 29, 2014


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          Orrick, Herrington & Sutcliffe LLP
                           1000 Marsh Road
                           Menlo Park, California 94205
                     By:   **Bas de Blank, Esquire**
                           **Siddhartha M. Venkatesan, Esquire**

**For Defendant**          Merchant & Gould
**Cardiocom:**             80 South Eighth Street
                           3200 IDS Center
                           Minneapolis, Minnesota 55402-2215
                     By:   **Daniel W. McDonald, Esquire**

                           Kirkland and Ellis LLP
                           333 South Hope Street, 30th Floor
                           Los Angeles, California 90071
                     By:   **Timothy G. Majors, Esquire**


**Reported By:**      *Katherine Powell Sullivan, CSR #5812*
                     *Official Reporter - U.S. District Court*

*Katherine Powell Sullivan, CSR, RPR, CRR*
*Official Reporter - U.S. District Court*
*(415) 794-6659*

                            **P R O C E E D I N G S**

**MAY 29, 2014**                                              **1:37 P.M.**

        **THE CLERK:**  Calling case C14-1575, Robert Bosch versus Cardiocom.

    Counsel, please come to the podium and state your name for the record.

        **MR. de BLANK:**  Good afternoon, Your Honor.  My name is Bas de Blank with Orrick, Herrington & Sutcliffe, for plaintiff Robert Bosch Healthcare Systems.

        **THE COURT:**  All right.  Good afternoon, Mr. de Blank.

        **MR. VENKATESAN:**  Good afternoon, Your Honor. Sid Venkatesan, also with the Orrick law firm on behalf of Robert Bosch.

        **THE COURT:**  All right.  Thank you.

        **MR. McDONALD:**  Good afternoon, Your Honor.  I'm Dan McDonald with Merchant & Gould, representing the defendant Cardiocom, LLC.

        **THE COURT:**  All right.  Thank you, Mr. McDonald.

        **MR. MAJORS:**  And good afternoon, Your Honor. Tim Majors from Kirkland & Ellis, also representing defendant Cardiocom.

        **THE COURT:**  All right.  Good afternoon, Mr. Majors.

    So let me ask a few questions.  Did RBHS know about this potential conflict as far back as 2007?

        **MR. de BLANK:**  No, Your Honor.  And to be clear, there

was no conflict in 2007.

I think what Merchant & Gould and Cardiocom were referring to was a predecessor company, Health Hero, had written a letter to Cardiocom back in 2007, and Merchant & Gould had responded on Cardiocom's behalf to -- to Health Hero.

To the best of my knowledge, Merchant & Gould has never represented Health Hero and there was no conflict back in 2007.

THE COURT:  That was prior to the -- well, Health Hero had been -- at least the Bosch group had acquired a majority interest in Health Hero as of December 2007.

MR. de BLANK:  That's correct, Your Honor.  And there was -- no one at Bosch was aware of the conflict in -- as of the acquisition in December 2007.

THE COURT:  And so what happened?  What was the transaction between Cardiocom, or attempted transaction between Cardiocom and Health Hero back in 2007?  Was there a discussion about a license, some patents?

MR. de BLANK:  So to be clear, Your Honor, this predates Orrick's involvement with the case.  But my understanding is that Healthcare sent a number of letters out to seek licenses for its patents.  One of those letters was directed to Cardiocom.  It appears that Cardiocom retained Merchant & Gould, and that Merchant & Gould responded to that letter on behalf of Cardiocom.

I'm not aware of anything else that happened in 2007.

**THE COURT:**  So it's kind of a one-shot deal declination; no further negotiations or lawsuits?

**MR. de BLANK:**  Yes, Your Honor.

**THE COURT:**  And that happened prior to December of 2007?

**MR. de BLANK:**  That happened prior to December of 2007.  And prior to the issuance of the patents that are asserted in this case.

**THE COURT:**  All right.  Then certainly, though, by the filing in July of 2012, of RBHS, of its first patent infringement suit, Cardiocom retained M&G at that point to come in, right?

**MR. de BLANK:**  Yes.  And that's when the conflict began, Your Honor.

**THE COURT:**  Okay.  So I understand that there are different legal tests, and the question about successive versus simultaneous representation and waiver, et cetera.  But to get to the factual question, I'm curious why nothing was done.  There was no motion to disqualify.  The conflict was as obvious then as it is now two years later.

Why?  I mean, why was nothing done?

**MR. de BLANK:**  Yes, Your Honor.  And let me be very clear.  There was no delay on Bosch's part.  There's no one at Bosch who understood or appreciated the conflict back in July of 2012, or much before the -- March 6, 2014, when we raised

the issue with Merchant & Gould for the first time.

What Your Honor needs to understand is that Robert Bosch GmbH is a multinational corporation.  It has a number of affiliates and subsidiaries, including Robert Bosch LLC, which directs/controls the legal departments across -- for the North American companies.

Robert Bosch LLC, and a number of other Bosch affiliates were clients of Merchant & Gould, and Merchant & Gould had entered into an agreement to represent the North American affiliates.  The particular affiliate, in this case Robert Bosch Healthcare Systems, had not itself directly used Merchant & Gould for legal services.  So there's no one at Robert Bosch Healthcare Systems that had a prior relationship with the attorneys at Merchant & Gould.

And while the attorneys at Robert Bosch LLC approved the retention of the lawyers, approved the filing of the complaint, are involved in supervising and overseeing the matter, it's not to the point of, well, let us tell you who the opposing law firm is, and they would run their own conflict check to see whether there was representation.

**THE COURT:**  Let me make sure I understand this.  So the LLC does approve counsel and bringing of a case?

**MR. de BLANK:**  Yes, Your Honor.

**THE COURT:**  So the subsidiary just can't do it on its own?

**MR. de BLANK:**  Correct, Your Honor.

**THE COURT:**  And there's a legal department, like a general counsel or somebody, in-house counsel at --

**MR. de BLANK:**  Yes, at both LLC, and there's some lawyers that work within the Robert Bosch Healthcare Systems that would report to the LLC attorneys.

**THE COURT:**  And they would not run -- I mean, so in approving this case and knowing who the defendant is, they don't make the inquiry, Counsel for LLC doesn't make the inquiry who represents Cardiocom?

**MR. de BLANK:**  No, Your Honor.  I've never heard of any client doing that.

The counsel for LLC retained Orrick, retained counsel for Bosch; approved the bringing of the complaint; would approve any resolution or settlement or dismissal of the complaint.

But no client expects that their own lawyers are going to be on the other side.  Each law firm handles their own conflict checks.  For instance, when Orrick was approached to represent Bosch, the first thing we did was run a conflict check and make sure that we weren't adverse to Cardiocom, and, therefore, could pursue the matter.

**THE COURT:**  And is M&G involved in this approval process, or is it only in-house counsel that looks at what the subsidiaries are doing?

**MR. de BLANK:**  Sorry.  M&G, do you mean

Merchant & Gould involvement?

THE WITNESS:  Yes, Merchant & Gould.  Do they, as retained counsel for the LLC, do they advise on such issues as approving cases brought by the subsidiary?

MR. de BLANK:  To the best of my knowledge, not as a general rule.  I mean, they -- Bosch has a number of law firms that it was using.  Merchant & Gould was one of them.  And usually one law firm would not consent or advise to the retention of different law firms.

THE COURT:  So Merchant & Gould was retained on an as-needed basis for specific pieces of litigation or transactions?

MR. de BLANK:  Yes.  Merchant & Gould and Bosch entered into a general agreement to provide general legal services.  When legal services were needed, Bosch would contact Merchant & Gould, get their work product.  They would -- Merchant & Gould would do the work; Bosch would pay them.  And that continued up until March 2014.

THE COURT:  And what were these general legal services?  What are examples of those?

MR. de BLANK:  Well, it varied by case and by entity. There was, I believe, six different patent litigations, for instance, both at the District Court and the Federal Circuit level.

THE COURT:  On behalf of the LLC and the subsidiaries,

is it?

**MR. de BLANK:**  Yes, Your Honor.  On behalf of various Bosch subsidiaries where the LLC was directing and controlling that litigation.

Similarly, there were opinion letters where Merchant & Gould would provide opinions to Bosch about patents that Bosch either wished to assert against third parties or concerns Bosch may have about third-party patents.

There was a significant amount of patent prosecution that Merchant & Gould was performing for a variety of Bosch entities, including the German parent company, Bosch GmbH, where they would, on Bosch's behalf, submit patents for filing in the Patent Office.  There were licensing negotiations, settlement discussions.  There were a wide variety of work, largely related to intellectual property issues.

**THE COURT:**  And in the litigation, was -- in which Merchant & Gould represented Bosch entity, was it always in the context of asserting a patent owned by a Bosch-related company against another party asserting infringement, or was there a defensive employment?

**MR. de BLANK:**  They were on both sides, Your Honor. They represented Bosch -- asserting Bosch patents against other companies.  For instance, against Black & Decker and Vicon Industries.  And then they represented Bosch as a defendant when companies like Lead Tool filed their own claims against

Bosch.

THE COURT:  And the six patent cases, what period of time would they span?  From when to when, would you say?

MR. de BLANK:  Yes, Your Honor.  I believe that in Merchant & Gould's opposition they said that they were conducting litigation on behalf of Bosch up through 2010. That's page 8 of their opposition.  And I believe that the patent cases began, I want to say, Your Honor, by around 2002, but I could be a year or so off.

THE COURT:  And none since 2010?

MR. de BLANK:  My understanding, Your Honor, is that 2010, that litigation is still ongoing, but Merchant & Gould transferred the case to a different law firm.

THE COURT:  When did that happen?

MR. de BLANK:  In 2010, Your Honor.

THE COURT:  Oh, right.  So its last representation in a patent lawsuit was in 2010?

MR. de BLANK:  That is my understanding.  But their representation in other matters continued every year continuously through March of this year.

THE COURT:  Such as opinion letters, patent prosecution?

MR. de BLANK:  Yes, Your Honor.

THE COURT:  And it's all intellectual property-related work?

**MR. de BLANK:**  Yes, Your Honor.

**THE COURT:**  So when was this first discovered that there was a conflict?

**MR. de BLANK:**  Uhm, Your Honor, the first it was discovered -- let me be specific.

February 28th I got an email, I think about 11:32 in the afternoon.  The substance of the communications are privileged, but we can make it available in camera, Your Honor, if you really want to see it.

But it was -- that was the first that there -- was raised the possibility that there was a conflict.  By Tuesday we had a -- we were investigating to see whether there had been a waiver or whether -- what seemed to be the facts that Merchant & Gould was simultaneously representing Bosch while being adverse were true.

I had a telephone conference with various Bosch in-house counsel at different divisions on Tuesday, March 4th, the following Tuesday.

On Wednesday, March 5th, we received the documents from Bosch at Orrick to confirm that Merchant & Gould was simultaneously representing them.

And on Thursday, March 6th, less than a week, we first raised the issue with Merchant & Gould asking for an explanation about the conflict.

**THE COURT:**  Has Merchant & Gould represented RBHS

specifically on any matters?

**MR. de BLANK:**  No.  There has been no work that RBHS has requested that Merchant & Gould perform.  But the same Merchant & Gould attorneys that are acting adverse to Robert Bosch Healthcare Systems represented other Bosch entities, both on the litigation and other matters.

**THE COURT:**  Right.  And in terms of decisions that would be made in this case regarding prosecution, settlement talks, et cetera, et cetera, is that something that has to be cleared through general counsel of the LLC?

**MR. de BLANK:**  Yes, Your Honor.  The general counsel -- the LLC would approve bringing the case, would approve settling the case, would approve -- we would have -- the in-house attorneys at Bosch have weekly discussions with the LLC and other attorneys.  I've had discussions with the LLC attorneys and attorneys in Germany about the case.

**THE COURT:**  So there's no independent autonomous authority on behalf -- on the part of RBHS to decide, for instance, to settle this case?

**MR. de BLANK:**  That's correct, Your Honor.  RBHS could not unilaterally settle this case without permission from the appropriate parties.

**THE COURT:**  Okay.  But in the parent company's decisions, for instance, to settle a case, it would not be normal for it to consult with Merchant & Gould?  That decision

would be made internally by counsel, general counsel?

MR. de BLANK:   It would depend, I think, on the case and the matter.   Obviously, the cases where Merchant & Gould was representing them, I suspect they would consult with them.

THE COURT:   But were they not representing them would --

MR. de BLANK:   It would depend on the matter.   If they wanted a second opinion or a new set of eyes, I can see circumstances where they would.   But I can't say it's routine.

THE COURT:   Has that happened where they were not counsel but they were sought as kind of independent third-party counsel to advise on a piece of litigation?

MR. de BLANK:   Yes, Your Honor.   Merchant & Gould would do opinion work, for example, where Bosch would ask them, What is the risk presented by these third-party patents?   Or If people asserted these patents against us, would we have a good faith defense?   What are the strengths and merits of the cases we could bring against third parties?

THE COURT:   What about once the case is -- I'm talking about in settlement of the case.

MR. de BLANK:   In settlement of the case, I don't know the answer to that, Your Honor.   I can't affirmatively say yes.

THE COURT:   But as you stand here today, you're not aware of any situation where Merchant & Gould advised the LLC about settling a case handled by somebody else?

**MR. de BLANK:** That's correct, Your Honor.

**THE COURT:** So what is the -- there's no claim here that there is any particular piece of information that Merchant & Gould would have obtained in the course of its representation of the LLC or the parent corporation relative to this case against Cardiocom?

I understand that there's an argument and there's an assertion that they are privy to the approach of the parent and risk adverseness and those kinds of things.

But in terms of specific information about this patent, this case, any defenses or claims, there's not a claim here there's confidential information that was obtained that would directly come into play in this case?

**MR. de BLANK:** Your Honor, we do say there is confidential and privileged information that was obtained that would come into play.

If you mean is there something specific to the particular patents asserted in this case that would be unique and only relevant to this case, then the answer would be no.

But in general -- and this is set forth in Sarah Taylor's declaration where she, as director of intellectual property litigation for Robert Bosch LLC, had a series of privileged communications with attorneys at Merchant & Gould concerning when Bosch would settle a case, what it would consider to be an acceptable settlement, its approach to --

**THE COURT:**  In these other six cases?

**MR. de BLANK:**  It's applicable across all cases.

**THE COURT:**  It arose in the context of --

**MR. de BLANK:**  It arose in the context of the other cases, that's correct, Your Honor.

**THE COURT:**  When Merchant & Gould was playing the role as representing one of the Bosch entities?

**MR. de BLANK:**  That's correct, Your Honor.

**THE COURT:**  And so, sort of, when to settle, or what? Can you be more specific?

**MR. de BLANK:**  Yes, Your Honor.  And it's set forth in Ms. Taylor's declaration, which was submitted as part of our -- with our opening brief.

She explained that Robert Bosch LLC, directs and controls the litigation.

**THE COURT:**  What paragraph are you looking at?

**MR. de BLANK:**  I am looking at paragraph 5.  She says that it's responsible for all intellectual property issues of the Bosch affiliated entities.

In paragraph 12 she starts detailing the specific discussions that she personally had with attorneys at Merchant & Gould.

And paragraph 12, for instance, she says:

"I had privileged discussions with Merchant & Gould attorneys concerning the case status, strategy,

discovering deposition issues, patent reexamination,

mediation, summary judgment," and so on.

She continues:

"I also had privileged and confidential discussions with Merchant & Gould attorneys generally concerning potential patent litigation damages and damages strategy, and specifically approving settlement of that case, about the terms of such a settlement, and what Robert Bosch would consider to be an acceptable settlement."

**THE COURT:**  So how do we know that those discussions were not peculiar to that particular case as opposed to something that spills over into, for instance, the instant case?

**MR. de BLANK:**  Well, Your Honor, because Ms. Taylor submitted a declaration where she explains that.

In paragraph 17 she states that Robert Bosch LLC, directs and controls the litigation.  And she continues:

"Thus the type of confidential and privileged information Robert Bosch LLC, provided to its attorneys at Merchant & Gould, including Robert Bosch LLC's view and approach to patent litigation, damages, settlement, the Patent Office post-grant review, and specifically the interplay between post-grant review and patent litigation is directly relevant to the Cardiocom litigation."

And that's unrebutted.  There has been no dispute by

Merchant & Gould that it has received privileged information, that it received privileged information of this type and character, and that issues such as damages, settlement, patent -- approach to patent litigation and post-grant review were all relevant to this case.

THE COURT:  All right.  Let me hear from the other side at least on some of the issues you've talked about so far.

So one question that's going to inform this analysis is whether there is, of course, only successive representation here, whether there's simultaneous representation.

And that turns in part upon whether we treat RBHS as a single entity for purposes of this analysis; which in turn turns on alter ego theory, unified interest, et cetera, single interest.

But the fact that it appears -- I don't know if this is rebutted -- that the parent company exercises a great deal of control over the legal affairs when it comes to litigation of its subsidiaries, including RBHS, do you have any contrary information?

MR. McDONALD:  Yes.  The information I have that's contrary to that, specific to this case, Your Honor, is in my Exhibit E.  I could put that up on the ELMO if you like.

THE COURT:  Let me see here.

MR. McDONALD:  Can you see it?  I can't see it on this screen.

**THE COURT:**  Yeah.  Okay.  That's your Exhibit E?

**MR. McDONALD:**  Yes, that's Exhibit E.

**THE COURT:**  Okay.

**MR. McDONALD:**  So this is an email from Mr. Jasper zu Putlitz.  He's the president of Bosch Healthcare Systems LLC (sic).

This was immediately before the first lawsuit.  This was dated June 5th.  He's sending a letter or email to the president of Cardiocom, Dan Cosentino, here, talking about the matter, referring back to the 2007 letter with the -- that came from Merchant & Gould.  You can see there specifically that he mentions he's aware that it was from Merchant & Gould.

Then he goes on to talk about the portfolio.  And just to be clear here, while the specific patents may not have issued back in 2007, the discussions about a license were to the whole portfolio, which would include the pending applications.  And the patents asserted in this case were all pending and would have been presumed part of the portfolio they were seeking to license back in 2007.

But directly relevant to your question, Your Honor, at the bottom here he proposes, "Let's try to resolve this issue to meet in person and discuss these matters..."  So he's talking about settling the whole matter at this point.  And he invites Mr. Cosentino and his team, which was at the time me at Merchant & Gould, to Palo Alto to discuss these patents.  Then

I'm going to go to the next page of it here, "...in detail in an effort to solve this issue once and for all."  My IP team"-- I underlined that.  I apologize for that underlining there. "My IP team led by Mr. Greg Mathis is prepared to meet with you and your team for such a discussion."  That's a discussion about solving this issue once and for all.

So this is the facts that we have about our case that Mr. Mathis, who was in-house at Bosch Healthcare Systems, specifically was the leader of a team that also included some other people at Bosch Healthcare Systems.  I believe the name was Serventi, was another gentleman there.

They were the people that were going to lead this discussion.  And, in fact, those were the people that were actually at the meeting that we wound up having then a few weeks later.  There was nobody from Bosch LLC, that attended that meeting to try to resolve this matter once and for all.

And that was the meeting that Mr. Mathis actually handed me the complaint then that started the litigation.  That was the meeting that took place in July of 2012.

So that -- that would be the specific facts that I had, Your Honor, that would show that Bosch LLC, was not making the decisions regarding things like resolving the case once and for all, which is a pretty big decision.

In contrast to that, we do have the declaration from the in-house counsel at Bosch LLC, but it was very short on facts

specific to this matter.  It was a bunch of generalities.  You read the paragraphs, it talks about this is my role generally with the affiliates.

She really doesn't say specifically about Bosch Healthcare Systems, and certainly not even specific to this matter or these two lawsuits, that she was playing that role or Bosch LLC was playing that role specific to these.

Now, she kept --

**THE COURT:**  Is there something to suggest that the LLC did not approve the bringing of these cases by RBHS?

**MR. McDONALD:**  Well, there's -- there's no statement that they did.

And the general statements that Mr. de Blank is referring to aren't specific to this lawsuit.  The specific facts we have is that they were in charge of trying to resolve the -- excuse me, the in-house people at Bosch Healthcare Systems were going to -- were leading the matter, leading the IP team dealing with this dispute, and that it was the Bosch Healthcare Systems people who actually handed me the complaint at that meeting.

So there was no indication, certainly in our interaction with them, that anyone other than the Bosch Healthcare Systems in-house IP team was responsible for what was going on there.

Those are the specific facts we have, anyway, about these lawsuits.

**THE COURT:**  Let me just stop you right there and find

out what the counterpoint is.

Where is there something that shows that the LLC was heavily involved and took, sort of, a controlling hand with respect to approving these suits, the suits that are now before Judge Davila and me?

**MR. de BLANK:**  Yes, Your Honor.  I'd beg two points.

First, the exhibit that Mr. McDonald put up is in no way inconsistent with Ms. Taylor's declaration.  It is true that Merchant & Gould and Cardiocom --

**THE COURT:**  Slow down.

**MR. de BLANK:**  I apologize, Your Honor.  Thank you.

It's correct that Cardiocom was invited to have a discussion with the people at RBHS.

**THE COURT:**  Yes.

**MR. de BLANK:**  There's -- that is in no way inconsistent with Ms. Taylor's sworn declaration, paragraph 5, which states the fact that attorneys at Robert Bosch LLC oversee and are responsible for all legal issues of the Bosch affiliate entities in North America, including without limitation intellectual property issues.

And she goes on and gives the specific types of examples -- of issues that they would have control over: Hiring/retaining outside counsel; directing legal strategy and making the final decisions --

**THE COURT:**  Did she say anything about these two

cases, the RBHS cases against Cardiocom?  Is there somewhere in this declaration where she says I approved of bringing these cases and chose counsel, et cetera, et cetera?

MR. de BLANK:  Your Honor, the whole declaration, paragraph 2, makes clear, submitted for exactly this matter. She's submitting it for this case and this motion, so that when she says attorneys at Robert Bosch LLC oversee and are responsible for all legal issues, that necessarily includes this legal issue.  Includes everything else.

THE COURT:  I understand your argument.  I'm asking you whether she specifically stated what her role is, or somebody at her office, the LLC's office role, in connection with these two cases now pending before this court.

MR. de BLANK:  Yes, Your Honor.  In paragraph 17.

THE COURT:  All right.

MR. de BLANK:  (Reading)

"Robert Bosch LLC directs and controls the litigation between Robert Bosch Healthcare Systems and Cardiocom."

THE COURT:  What is your response to what?

MR. McDONALD:  My response, Your Honor, is that that email I showed you was about needing to resolve this case once and for all, where we brought people with absolute authority to resolve the case.

Mr. Cosentino was president of the company at the time. This was before they were acquired by Medtronic.  He came to

that meeting with Will Cosentino, his father, who was another key member of the board.  They could have made a deal that day.

And that was our understanding from this email from the president of Bosch Healthcare.  Let's resolve this once and for all.  Let's sit down together with Greg Mathis and the people from Bosch Healthcare Systems.  We can do a deal now.

And if, in fact, what was going to happen at that meeting is what Mr. de Blank is saying now, that, okay, we understand your position, but we have to go back and take this to somebody else, we can't make any deals, that was not what was represented to us when we got on that airplane and flew from Minnesota to Palo Alto to --

**THE COURT:**  Let me get your response to that.

The settlement authority, the appearance is that they had full authority to settle without LLC involvement.

**MR. de BLANK:**  Well, I can't speak to the conclusions that Mr. McDonald drew from the email, but what I can point to is that there is nothing in this email that says RBHS can settle without consulting LLC.

Robert Bosch cannot -- Healthcare cannot settle without consulting LLC.

Had those meetings occurred, and had they been productive, and had there been discussions -- a settlement -- sorry.

Had there been a settlement offer made that would warrant a response, then they would call up our LLC and run it past

them.

There are weekly approval meetings, weekly meetings between RBHS attorneys and the LLC attorneys about the case, about the status.

There's -- there's simply nothing in this email in this letter that's in any way inconsistent with the sworn declaration from Ms. McDonald (sic).

THE COURT:  Let me ask --

MR. de BLANK:  Sorry --

THE COURT:  -- Counsel, if you have anything else, other than this one letter, from which one could infer independent authority.

Is there anything else to rebut the assertion that the LLC controlled litigation, including the litigation that's now in front of me?

MR. McDONALD:  Well, I think the other fact, Your Honor, is a little more circumstantial, but I think it is relevant and responsive to your question.

And that is that if we take what Mr. de Blank just said as true, that they were having these weekly discussions with LLC, there is simply no explanation then for how they didn't appreciate -- I think was the word that they used in their brief, and I heard it again today -- that Merchant & Gould was adverse to Bosch Healthcare while it was representing some other Bosch-named entity.

If they were really meeting that often and they were that intertwined with what was going on in this matter -- Merchant & Gould has been adverse in every document filed in both of the two lawsuits for about two years.  Merchant & Gould filed and was responsive and adverse in about 20-plus reexaminations and IPRs.  And it just strains credulity -- credibility, I think, to say that they were really involved at that sort of level and yet they did not appreciate that we were adverse to them.

**THE COURT:**  All right.  So how could that be?  I mean, I assume if LLC folks were that involved, they would at least bother to look at pleadings and be familiar with something about the case.

**MR. de BLANK:**  Your Honor, they were advised about the case and about the issues that were important for them to make the decision.

Frankly, the identity of the opposing law firm is not an issue that is relevant to them.

Let me give you an example, Your Honor.  If, in this meeting, Merchant & Gould had come and said, okay, look we have an offer from Cardiocom, we will pay X amount of money to license the patents, RBHS would have picked up the phone, talked to LLC, either got agreement or not got approval, and then either accepted the offer or not.

**THE COURT:**  They wouldn't transmit, for instance, the

offer, which would be on the letterhead of Merchant & Gould? Just do a phone call and you don't look at the documents?

          **MR. de BLANK:**  It depends on the detail, Your Honor. If -- this is all hypothetical.

     If Cardiocom had in 2012 shown up with a written offer on the letterhead of Merchant & Gould, and wanted to wait while this was transmitted, then they probably -- they certainly would have.

     What is more likely is they would have picked up the phone and said, look, we've got an offer.  Can we agree to this?  We think it's a good idea.  We think it's a bad idea.

     Similarly, in the weekly discussions on the case status, the discussions are all on the order of:  Had there been motions that have been filed?  Have there been significant events that have occurred?  Has there been a settlement offer or not?  Has there been a mediation?  Has the Court issued an order?

     Enough facts to keep Robert Bosch LLC apprized of the status of the investigation so they can evaluate the conduct of their attorneys' work who represent them.

     But it doesn't -- the -- contrary to Mr. McDonald's point being the -- this explains why Robert Bosch Healthcare Systems did not understand that there was a conflict with Merchant & Gould, because the attorneys that handled the day-to-day interaction with Merchant & Gould were at Robert

Bosch Healthcare Systems.  The ones that would approve the settlement or approve the bringing of the filing of the case are Robert Bosch LLC.

THE COURT:  Where is there a declaration that states that the LLC was unaware that Merchant & Gould were representing Cardiocom in this case until -- you said it was February 28th.  Is there an affirmative statement to that somewhere in here?

MR. de BLANK:  It is not -- it's not in the declaration, Your Honor.

I can represent, as an officer of the Court, that I got the email from them on February 28th, at, I believe, 11:32 in the afternoon.

We had a call about it immediately; were quite excited about the prospect.  I mean excited in terms of alarms -- alarmed.  And that was what began the process.  There's no evidence to the contrary.

THE COURT:  Well, there's no evidence in support, I mean, in terms of admissible evidence.  There's no declaration under penalty of perjury that nobody at the LLC knew about Merchant & Gould.

MR. de BLANK:  You're right.  The declaration that was submitted was from -- that LLC knew at Merchant & Gould?  No, you're right.  Ms. Taylor's declaration did not address that.

If that was important, Your Honor, we can supplement the

record.

THE COURT:  And your belief and you are convinced that if asked to so testify under a declaration of penalty of perjury that Ms. Taylor would so testify?

MR. de BLANK:  That is my understandings and belief, yes, Your Honor.

THE COURT:  And if that's true, pretty hard to make a waiver argument then.

MR. McDONALD:  Well, Your Honor, the Bosch LLC apparently was informed at some broad level about what's -- what was going on by Mr. de Blank.  That's his testimony.

But it conflicts with the point he's trying to make, which was that they were actually directing and controlling things. It just doesn't add up that they directed and controlled the litigation from this other corporate entity without seeing a single document in the case.

And it seems like they're trying to have their cake and eat it too here about Bosch LLC --

THE COURT:  Well, let me ask.

Mr. de Blank has, I guess, sort of offered for the Court to review in-camera the key email that discloses this.  And if the Court were to look at this, one could -- I'd have the ability to assess the credibility because if it was truly a surprise, and this is an authentic email, that might be apparent from this.

And if it's also backed up by a declaration under penalty of perjury from Ms. Taylor, that no one at the LLC was aware of Merchant & Gould's representation -- adverse representation in the Cardiocom cases, it seems to me that's -- that might put that issue to bed, unless we assume somebody is committing perjury or forging some kind of --

**MR. McDONALD:** I think it might address the waiver issue, Your Honor. But then it also proves our case in the fact that those companies are very distinct, if she had that limited a role -- if the LLC was so limited with the prior two years of these proceedings.

So, yes, maybe no waiver; but, on the other hand, yes, these companies are so distinct that that former representation doesn't cross over here.

**THE COURT:** Well, all right. So I am going to ask that you submit this under seal, this February 28, 2014 email, because now the issue has been raised. And I do think Ms. Taylor should supplement her declaration.

And so I do want to put that issue to bed. I don't want to turn this on a factual issue that I get wrong. So that's fair.

So let's assume that that is the case for now. And I'll give you until next week, seven days from now, to submit the additional materials.

**MR. de BLANK:** And, Your Honor, I just want to

confirm.  I think you said under seal that the email would be submitted in-camera, and that it doesn't constitute a waiver of the privilege.

THE COURT:  The email, yes, will be submitted without waiver because that may be a privileged communication.  But I think it's something that should be looked at.

MR. de BLANK:  Thank you, Your Honor.

THE COURT:  All right.

Now, if that is the case, what about the argument now that, well, it shows that there's not a single entity here; therefore, there's not -- to your point, I guess, there's not simultaneous representation, and at most there might be some form of successive or you would say not even successive --

MR. McDONALD:  I would say not --

THE COURT:  -- it's not even -- of course, your response is, well, they may not have known this fact, but they did control litigation, as stated in paragraph 17; and, therefore, there is still sufficient involvement here to constitute the single entity.

MR. de BLANK:  Correct, Your Honor.

And I would add, however, that we believe that there's simultaneous representation; that if you look at the engagement letter signed by Merchant & Gould and signed by Robert Bosch LLC it applies to the Robert Bosch affiliated entities in North America.

There is no dispute that Robert Bosch Healthcare Systems is one such entity and Merchant & Gould was providing general legal services.

**THE COURT:**  Yeah.  Except the subsidiary RBHS didn't exist at the time, so then you have to construe that retainer agreement as -- you have to add the word "future" in brackets in there, and any future subsidiary of the LLC.

It doesn't say that.  It could easily be construed to mean that's going to provide representation to all current subs.  I mean, it doesn't say one way or the other.

**MR. de BLANK:**  Your Honor, I think the language is clear it was one or more affiliates.  That's why the "one or more" language is there, so that it would cover all the subsidiaries and all affiliates.

**THE COURT:**  Well, there were also one or more at the time.  There were several affiliates.

**MR. de BLANK:**  Yes, Your Honor.

If I could just point out, I mean, the discussion has been focusing on the steps Bosch could have taken or when Bosch first learned of the conflict.

I think the real issue is when Merchant & Gould understood that it was -- the conflict existed, and why they did not take any steps to prevent the problem.  At a minimum, alerting Robert Bosch LLC or Robert Bosch Packaging, or any of the entities for which they were doing work, that we are going to

now be adverse to another Robert Bosch-named company.  And, in fact, that we are going to use the same lawyers that are doing work for you right now to actively be adverse to that Bosch entity.

The policy behind the whole conflict system and what the case law says is that it is the obligation of the lawyers.  It's the ethical obligation of the lawyers to prevent these conflicts.

**THE COURT:**  Do you have any comment on that, Counsel?

**MR. McDONALD:**  Well, Your Honor, I guess my response is we would -- represented Cardiocom beginning in 1999, and were representing them specific to this matter at least by 2006.  And then 2007, as we saw, we had a letter.

So the representation that we had of Cardiocom long predated the existence of Robert Bosch Healthcare.  And, moreover, we had no facts at all in our knowledge as to when that happened and how that company would have been related. We've got this affidavit now, that they filed, that talks about how the interworkings might go, but that was not knowledge that we could have to understand that.

And to your point, this was an entity that did not even exist at the time we signed that agreement.  Moreover, in that agreement, I think if we can turn to another sentence in there, or paragraph, I think it really shows how this wasn't meant to be a blanket agreement for all affiliates but, rather, was

to -- this was an introductory agreement that was to be followed up by specific conflict checks as specific representations came along.

Can I put up that part of the agreement on the ELMO?

THE COURT:  Yeah.

MR. McDONALD:  Thank you.

So this is the first page of that agreement that has that language about the one or more Bosch affiliates.  And on the second page of that, there's this heading here up at the top, "Conflict of Interest Check."  And it says:

"Before rendering any services in connection with a specific assignment, please determine and confirm, by communication to the supervising attorney, that no actual or potential conflicts of interest exists with respect to representation of the company by you."

Clearly, this is contemplating that this -- this agreement, we're not going to run a hundred conflict checks, or 300 conflict checks for however these one or more affiliates that were never even identified to.  Us, that wasn't how this was going to work.  This was an agreement that says, okay, you're going to do some work for us.  This sets the stage.  But as you start doing work for any one affiliate, we'll run a conflict as we go, along the way.

And so I think that reinforces the points Your Honor was making, that this certainly doesn't cover a blanket as to

affiliates that didn't even exist at the time.

THE COURT:  So what was the purpose of this retainer agreement?

MR. McDONALD:  I think it was to describe how things would work to the extent we started working for affiliates later.  But rather than cross all the bridges on the day this was signed, it was clear that it was saying, we will follow up for conflict purposes as we get to each bridge.

THE COURT:  So it's really just a, kind of, foundational preparatory kind of agreement?

MR. McDONALD:  Yes.  That's how I would characterize it.

MR. de BLANK:  May I respond to that, Your Honor?

THE COURT:  Yeah.

MR. de BLANK:  Two points.

One is that it's not a foundational preparatory agreement. It is the sole and only agreement between Bosch and Merchant & Gould, under which Bosch paid Merchant & Gould, I believe, close to $10 million over this period of time.

There are not separate engagement letters between Merchant & Gould and the various Bosch entities, precisely because there was one general agreement:  Merchant & Gould would do the work; Bosch would pay them.  Bosch upheld its end and paid them.

With respect to the specific provision that Mr. McDonald

was pointing to, the conflict check -- conflict of interest check, that simply articulates exactly what Merchant & Gould should have done under these circumstances.

Bosch and the Bosch affiliates were clients of Merchant & Gould.  If the Bosch affiliate calls Merchant & Gould and says, we have this matter that we want you to take for us, you are our lawyer, we are your client, we want you to sue Cardiocom, for instance, Merchant & Gould at that point needs to perform a conflict check.

And if it discovers there's an actual or potential conflict -- in this case there would have been -- it needs to not do any work.  And then, in fact, it said go back to Bosch and say, I'm sorry, we can't do that because there's a conflict.

THE COURT:  Let me ask you something.

The agreement says that if we're going to utilize you for any specific litigation during our relationship, a separate retention agreement specific to that litigation matter will be executed.

Are you saying no specific retention agreements for the six lawsuits were never executed?

MR. de BLANK:  I believe -- yes, Your Honor.  Bosch has looked for additional retention agreements between Bosch and Merchant & Gould.  We have not found any.

I believe Merchant & Gould has looked for additional

agreements, and they have represented that they have not found any.

As far as I understand, this --

THE COURT:  So the parties didn't follow this --

MR. de BLANK:  Well --

THE COURT:  -- process.

MR. de BLANK:  Apologize.  I didn't mean to interrupt.

I think, Your Honor, a part of the answer may be that -- I'm not sure that there was any new litigation matter created after September 18th, 2007.

There was work in previous matters that was continuing, but I am not sure that there was a -- that they were utilizing Merchant & Gould services for a new litigation matter that would -- where a separate retention agreement would have been negotiated.

THE COURT:  Why doesn't that provision suggest that there's no -- especially with a newly-created entity that didn't exist in 2007, that if it was going to do work for that entity -- and I assume, you know, there was going to be litigation if it had been approached for some reason to sue somebody else that wasn't represented by Merchant & Gould, that there would have been a separate retention agreement required.

MR. de BLANK:  Your Honor, my understanding of that provision is that -- litigation is a very expensive prospect for a company; it's a very time-consuming prospect for a law

firm -- that there was specific retention agreements that would be negotiated for individual litigation matters because of the size and scope.

There might be, for instance, negotiations on discounted rates because of the volume, but that for the provision of general legal services to any affiliate, including Robert Bosch Healthcare, this agreement covered.  And pursuant for the last seven years, Bosch has been paying Merchant & Gould bills under this agreement.

THE COURT:  So that's the next question I have.

So the Bosch LLC pays the bills even if -- in connection with Merchant & Gould's representation of an affiliate in litigation.

Who pays the bills if they're representing -- if they're doing work for an affiliate?

MR. de BLANK:  The bills are, I believe, reviewed and approved by Robert Bosch LLC.  Whether it is drawn from a Robert Bosch LLC account or an account for an affiliate, I'm not sure.

THE COURT:  So it might be charged to the affiliate, but you're saying it's all approved first.

MR. de BLANK:  Yes.

I know that Robert Bosch LLC was invoiced, I believe, every year since 2007, because Merchant & Gould was doing work directly for LLC.

I'm not sure whether the additional Bosch entities that were being -- performed work, that that came out of an LLC account or came out of their account that was approved by LLC.

THE COURT:  So one thing I'm going to ask you to include in the declaration from Ms. Taylor is to flesh out paragraph 17.  I need more specifics than just saying, "I directed and controlled."

I want to know, did she have a role in choosing counsel?  Did she have a role in reviewing -- you know, in making the decision to bring the case?  Is the LLC reviewing the bills of counsel?  What is its role?

I need more specifics.  Because that also informs, to a certain extent, the *Knudsen* factors, which we look to to determine whether there's a unity of interest here.

MR. de BLANK:  Yes, Your Honor.  We can add that in the declaration.

But from my personal experience, I can tell you that when Orrick interviewed with Bosch for this matter, we met with attorneys from LLC.  And what I've been told, when we submit the bills, is that they go -- they are approved by LLC before they get paid to us.

But we'll include that in the declaration.

THE COURT:  All right.  Well, let me ask this question:  One factor that plays into the analysis or this waiver or any other is whether there was a purposeful tactical

advantage gained, particularly in the timing of the disqualification motion.

What do you discern as the peculiar tactical advantage gained now by, for instance, waiting until this point, after the case got transferred out here, to bring this motion, as opposed to some earlier point?

MR. McDONALD: Well, at this point, Your Honor, it would be extremely disruptive and prejudicial to Cardiocom's defense of two lawsuits and over 20 adverse reexamination and *inter partes* review proceedings which are being handled by Merchant & Gould exclusively.

We have a tremendous body of knowledge we have developed now, of the prior art, of the claims, how the claims would be construed.  This is a lot of different work.

We've got a very substantial team that's coordinated on this.  And to require Cardiocom to drop everything at this point would be very prejudicial to them.  And Bosch knows that.

And I think we got a little hint of that at the argument today, Your Honor, when Mr. de Blank said that when he got word, apparently, that there was this possible conflict, they got excited about it.

And they got excited about it because they knew it would be a tactical advantage.  That's the only explanation for the use of that word.

THE COURT:  What's the status of the reexamination?

What's going on?

**MR. McDONALD:**  There's one where the claims have been rejected of the patent.  That's on appeal now.  So the parties have been briefing that as Bosch has taken an appeal trying to overturn the Patent Office rejection of all the claims.

This is going to the first lawsuit now, because those had the reexams.  There are other ones who just recently, I think -- last week we had a couple of actions closing prosecution, which are almost to the appeal stage.  That's basically where the examining court is saying we made our decisions.

And, again, in these cases they are rejecting or canceling all or virtually -- I think maybe one case, out of dozens of claims there was maybe one claim that at this point they are saying they would not reject, but all the other ones are.

**THE COURT:**  On what basis?

**MR. McDONALD:**  Pardon?

**THE COURT:**  On what basis?

**MR. McDONALD:**  Prior art.  Invalidity under 102 and 103.

So we are getting close to the appeal stage for a couple more of these.

All the *inter partes* ones are at various stages where the claims were rejected.  There was one ex parte we couldn't bring *inter partes*, where we didn't have a chance to be responsive,

where the claims were allowed on that.  But that's also the subject, now, of reexamination on obviousness-type level patent.  I think it's going to get started soon on that.

There are some other reexams that also address that. There are some obviousness-type double patenting.  It's kind of a term of art that has to do with whether Bosch and Mr. Brown, the inventor here, have some other patents that cover such close territory in the claims that those patents should somehow be co-extensive in time, et cetera.

The IPRs, Your Honor, in this case, four of the six patents are already in IPRs, where we're going through the trial.

THE COURT:  Is there a trial scheduled?

MR. McDONALD:  Yes.  The hearing is in September.  I believe it's about the 9th of September, on those four.  Those four, the Patent Office has found us reasonable likely to prevail.  That's what they found to institute the trial.  Three of those involved all of the claims.  One involved some of the claims.

For the others there have been some new IPRs that are recently filed that are going through the process, but there hasn't been a decision on those yet.  Basically for the remaining claims that aren't covered by the September trial.

And so very far along we just took the deposition of their expert for three days last week.  I took it for these four IPRs

that are going on right now.  Our response is due in a couple of weeks.  We've got response after response coming in for these various almost two dozen proceedings going on.

So that's the tactical advantage.  The timing, I think, has a lot to do with winning the motion to transfer the case from Texas.

I think Bosch thought that was their way around the stay of the first case, because Texas is relatively adverse to stays, and they were hoping they could get a fast track there, and hoped the Court would be reluctant to give a stay.

Case law already indicates that the Texas courts want a decision to come in, that decision to institute trial, before they'll even consider the stay.

So we had to wait until this year basically, even though we filed the IPRs last year, to even consider moving in Texas. And by the time we got to that point, our motion to transfer, which we had filed soon after the case was brought, had just been granted.  That was in March of this year.

That decision to transfer, really, I think, in Bosch's mind, disrupted their strategy here, and now puts us in a position where we have a chance to fight back now and show that all of these -- 12 of these patents are invalid, just like we showed the last six are or will be found invalid.  We think we are going to find these closely related second group of six as well.

They were hoping to rush us to trial before the Patent Office got a chance to weigh in on that.  And now that it doesn't look like that, they were looking for a chance to retaliate.

THE COURT:  Here's what I want:  I want a further enhancement of the Taylor declaration to talk about more specifically what the prejudice is here.

I understand the general point about, well, you know, they've represented Bosch in some other cases, so they get a sense of their -- how they assess cases and their views.

But I want to know more specifically what it means in specific terms.  What is the specific prejudice here.

MR. de BLANK:  Yes, Your Honor.  We can supplement the Taylor declaration to include that.

The case law is clear, and it's a difficult position for us because -- and the case law is clear that we don't need to waive the privilege in order to substantiate the motion to disqualify.

THE COURT:  Well, I understand that.  It depends on which ground and whether we end up finding unity of interest or not, and whether or not there's a successive and/or simultaneous and/or no, you know, representation.  I understand there are a number of factors.

But there's a good chance that this may turn in part upon whether or not -- certainly, this would be a very clear case if

there was, you know, information about these patents and the prosecution of these patents, very obvious situation.

But here the assertion is of a more general nature of strategic values and this sort of thing, which I don't know how much meat there is to that bone.

So I want to give you a chance to enhance that.

MR. de BLANK:  I appreciate that, your Honor.

And may I respond, also, to Mr. McDonald's point?

THE COURT:  Yeah.

MR. de BLANK:  First off, in response to your question about whether they're the same patents and that being the -- it would be an easier case if they were the same patents, we cite this in our brief, but in the *Sunbeam Products vs. Oliso* case, the -- this Court, the Northern District, stated in the patent context:

"Courts within the Ninth Circuit do not require the patents at issue in the successive representations to be identical or even essentially the same."

The same technical patents let -- the same patents, not even the same technology, is required for disqualification because of these broader issues.

But to respond specifically to Mr. McDonald's point, I believe he misspoke because he said that Merchant & Gould was exclusively representing Cardiocom in all these matters, and that's not the case.  Kirkland & Ellis is representing

Cardiocom in the litigation as well.

And recently another law firm, Sterne, Kessler, has been filing these new Patent Office challenges against the Bosch patents on behalf of Cardiocom.  Not the Merchant & Gould law firm, Sterne, Kessler.

And most of the discussion that Mr. McDonald had about the status of the proceedings were on -- with respect to the patents in case one, all the cases where he said those claims have been rejected, the Patent Office has canceled claims, none of that has happened in case two.

What has happened in case two is they filed seven IPR petitions on six patents, initially.  The Patent Office rejected two of them outright, saying they had not even met their low threshold of showing any sort of reason to conduct an IPR proceeding; rejected the petition on half the claims, many of the asserted claims for a third patent; and instituted some of the other petitions.

Those petitions are -- that happened in January, and those -- those IPR proceedings are, well, proceeding.

**MR. McDONALD:**  There are a few things I need to respond to.  I'm losing track, Your Honor.  Can I jump in now and respond to a couple of those before I forget the other ones?

**THE COURT:**  Well, no.  Write those down.  Let him finish.

**MR. McDONALD:**  Okay.

**MR. de BLANK:**  Just the very last point, Your Honor.

There is implication that Bosch is pursuing the motion to disqualify because of the transfer decision in Texas.  I think they actually say that in their opposition.  And that's just -- it's just factually not true, and it's contradicted by the evidence.

If you look at Exhibit 1 to my declaration, that is the email that I sent less than a week after we first learned about the conflict, to Merchant & Gould, raising the issue, raising the potential for disqualification, that email was sent on March 6th, before the Texas Court ruled on the motion to transfer.

I had an in-person discussion with Mr. Schultz on March 7th, where I raised this again and memorialized it during a deposition.  Again, prior to any grant of the order by the Texas Court.  This motion to disqualify is absolutely not brought for tactical reasons or because we are in California as opposed to Texas.

**THE COURT:**  All right.

Your rebuttal.

**MR. McDONALD:**  Okay.  On the last point, they brought it up a couple of days before the decision came in, but the decision had been pending a while.  And I think we both were getting a sense that the judge in Texas might well transfer it.

But I agree that's not the only tactical consideration here. The other tactical consideration was our success at the Patent Office. And that was clearly happening before they first contacted us about the conflict issue for these over 20 proceedings.

And, yes, there was another law firm that handled a couple of those. But we, ourselves, are the only ones handling over 20 of them, about 90 percent of the proceedings going on there.

So, clearly, that's -- that's a possible motivating factor for a tactical reason to try to get us off of this and disrupt Cardiocom's defense.

They indicated it was a low threshold to get those IPRs. It's actually a very high threshold. It's higher than the old threshold for getting *inter partes* reexams going.

We are reasonably likely to prevail. That was their finding in the --

**THE COURT:** What about the point that you've got Kirkland & Ellis, Sterne, Kessler, other offices that may be able to come in and --

**MR. McDONALD:** Kirkland & Ellis got on board when the case was transferred here to California in about -- in April.

The lawsuit itself began last spring, 2013. The other case began in 2012.

Kirkland had no role in either of those cases, and has had no role -- until April of 2014. They continue to have no role

in the Patent Office proceedings either before or after April 2014.

So the nature of their role is very --

THE COURT:  Well, I understand that there's going to be -- there's always some inefficiency when you lose counsel, change counsel.

But the idea that somehow life can't go on or, you know, the sky is falling, the fact that you have got other counsel at least partially involved in one of the cases, does that mitigate the --

MR. McDONALD:  Well, they're local counsel on the case.  We don't have a presence in Northern California.  That's really been their role to date.

So I understand that at some point you can change firms. I think that's a very big disruption.

I think in this case, as you look at that spectrum, though, about how much we have been involved in contrast to how little Kirkland & Ellis has had a chance to do in the short time they have been involved, this case is certainly at the far end of the spectrum there of how disruptive it might be.

I also wanted to respond, if I may --

THE COURT:  Well, let me ask you this:  I mean, I'm sure the counterargument is that by continuing to represent Cardiocom, knowing that you had represented, at least had a retainer agreement with the parent, even if you are correct

that there is no vicarious representation of RBHS, there's a risk that that might be found. I mean, those are all fact-based questions.

And so what about the argument that Merchant & Gould and its client took the risk? I mean, if anybody knew there was a conflict or potential conflict or argument for conflict, you knew it.

**MR. McDONALD:** Well, what we knew is that when they sued in 2012, they filed a certificate of interested parties. And they listed Robert Bosch North America and Robert Bosch GmbH. And they did not list Bosch LLC.

And we knew that we had no relationship, no agreement with Robert Bosch North America or Robert Bosch GmbH as part of that deal.

North American may have had some role in there somewhere, but they don't list them as anybody we'd been doing work for for the last four years. That's for sure.

And so this Bosch LLC entity wasn't even part of the chain of entities they identified as an interested entity when they brought these lawsuits.

So there really wasn't a lot of indication here to us about how this would be a concern to -- they were not a parent.

**THE COURT:** Is that accurate? The certificate of interest which we require in the Davila case did not list the LLC?

**MR. de BLANK:**  It didn't list the LLC because it's not -- it doesn't have an ownership interest.  The interested party who owns it.  It does list Robert Bosch GmbH.

And I think Mr. McDonald misspoke.  Merchant & Gould was, until March, doing work for Robert Bosch GmbH, the German parent over all of this.  We found it after --

**THE COURT:**  Through this retainer agreement or through what?

**MR. de BLANK:**  We have not found, and they have not produced to us, any other engagement letter.

But when we -- after this came to a head, Bosch fired Merchant & Gould on March 14th, and directed them to transfer all the work they were doing to another firm.

And they transferred a number of patent applications that they were filing on behalf of Robert Bosch GmbH, the party that they identified as being in the certificate of interest, that they were working for.

**THE COURT:**  As of when?

**MR. de BLANK:**  As of March 14, 2014, this year.

**MR. McDONALD:**  I guess I was relying on paragraph 9 of the Taylor declaration, where she listed the entities -- Bosch entities for whom Merchant & Gould worked.  And since 2011, the only entities are Robert Bosch Packaging Technology Inc., and Robert Bosch LLC.

I actually don't see GmbH listed at all between 2002 and

2014.  So I don't -- I'm not sure if there was some patent application, Your Honor, as I stand here right now, that does have GmbH's name on it.  I'm just saying I was relying on what they were representing in their declaration as the representations here.

MR. de BLANK:  And to be clear, Your Honor, that paragraph 9 Mr. McDonald is referring to are the affiliates of North America.

For him to say that even today, while we're in a hearing on a motion to disqualify, he doesn't know whether his firm is doing work as of last month for Robert Bosch GmbH is, frankly, incredible, given that they had transferred the files for that client to another law firm because of this hearing.

THE COURT:  Well, my simple point is -- and I don't know whether it's legally relevant or not -- that the disruption that might occur might be viewed in the context of an assumption of risk, to a certain extent.  It just didn't come out of completely left field.

MR. McDONALD:  Well --

THE COURT:  You may disagree with the merits of their position.  I'm sure you do.  But, certainly, a risk is entailed.  Even if their specific name is not involved, there's always a risk when you see Robert Bosch Corporation, et cetera, et cetera, that under the unity of interest rule or the alter ego rule or something else that there might be some imputation

and single entity analysis might obtain.  I'm not saying it does, but I'm saying there's a risk.  Now, whether that's relevant, I'm not even sure that's relevant or not.

**MR. McDONALD:**  You know, I haven't seen that type of discussion in the case law, Your Honor.

Can I talk briefly about the substantial relationship issue, a little bit?

**THE COURT:**  Yeah.

**MR. McDONALD:**  We haven't talked about some of that stuff.  Just I want to go a little bit to the request that you have for the follow-up information.

**THE COURT:**  Okay.

**MR. McDONALD:**  The affidavit talks about talking to Merchant & Gould attorneys, and doesn't identify any specific names.

I believe that is probably true because the discussions they are describing are for these lawsuits that were all brought before 2007, as counsel has just acknowledged -- nothing was brought after that -- were most likely with Mr. Swenson, who left the firm in either -- I think it was in 2009, maybe early 2010.

And it just -- part of the substantial relationship test goes to the subject matter, part goes to the nature of the relationship with counsel.  And I think that's an important point here that that counsel that might have had that

information has been gone from our law firm for all these years.

THE COURT:  Is that in the record?

MR. McDONALD:  Which part of that?

THE COURT:  About counsel who had that relationship.

MR. McDONALD:  Yes.  Mr. Swenson, I think we have it in the record that he left the firm in either 2009 or 2010. He's the one that signed the client agreement letter from 2007, as well.

So I think that's an important thing for the Court to make a note of if they're going to get this encounter information, because the whole point is whether -- what level of risk is there that there might be confidential information that the firm got that could actually have an impact on this ongoing activity.  And I think that makes it basically impossible, or gets it very close to zero, that there's going to be a risk here, that those disclosures could have an impact on this litigation.

I'll also note on the other aspect of substantial relationship, counsel cited the *Sunbeam* case.  There was a quote about it doesn't have to be the exact same patents.  And he indicated that that's an indication that it doesn't have to be the same technology.

Actually, the facts of *Sunbeam* are that the patents in both matters had to do with vacuum seal technology.  It was the

exact same sort of technology, even though the patents were not identical.

Here, in contrast, we've got remote healthcare monitors in this one business that we're adverse to this Bosch Healthcare right now, which is a very different technology from the -- packaging business is the only one we've been really doing the patent work for for the last few years.  That has to do with cracker packages, I believe, is what I understand anyway.  And those lawsuits had to do with power tools.

        **THE COURT:**  So the six lawsuits involved power tools?

        **MR. McDONALD:**  That's my understanding.

        **THE COURT:**  Is there somewhere in the record where the nature of these six suits and the patents involved therein, what they concerned?

        **MR. de BLANK:**  Yes, Your Honor.

   Mr. McDonald's understanding is contradicted by his own opposition.  I believe that he goes through a variety of technologies that these litigations related to.  I believe they list alarm, security devices, alarms.  I don't believe any of the litigation actually related to packaging.  I think --

        **MR. McDONALD:**  That's fair, Your Honor.

   What I meant, those last four years that they identify, the packaging company, that was all prosecution work.  I'm sorry if that was unclear.  I wasn't meaning to say that was the litigation.

**THE COURT:**  The litigation, give me a brief summary of what those cases involve compared to the instant.

**MR. de BLANK:**  Your Honor, I can't represent it's correct, but on page 7 of Merchant & Gould's opposition, they describe the work for the other Bosch entities as involving security systems, power tools, accessories, automotive products, packaging.

**MR. McDONALD:**  That's everything.  The litigation, though, if you look at the list from Ms. Taylor's declaration, it's Robert Bosch Tool Corporation vs. Black & Decker, and vice versa.  That's three --

**THE COURT:**  What paragraph?

**MR. McDONALD:**  Paragraph 11.

And this doesn't necessarily tell you on its face the patent technology.  The patents, I think, are in those Pacer reports that were provided.

But I'm pretty confident that all those ones that involved Black & Decker had to do with things that were in the nature of power tools, especially because of the -- or some sort of tools, because of the name of the Bosch entity as well as Black & Decker.  They may not have been power tools, but I think they were tools of some sort.

**THE COURT:**  Whereas, the instant case involves monitored --

**MR. McDONALD:**  Patient or healthcare monitors in

general, right.  That's where Cardiocom comes in.

THE COURT:  What about this Electro --

MR. McDONALD:  I'm not sure what --

THE COURT:  *Electro Alarm Custom vs. Vicon*.

MR. McDONALD:  I have to admit I don't know what that one's about.  I know it's not healthcare monitors.  It might be security.

It might be -- I don't think either of those two parties is actually a Bosch entity.  This is an et al. sort of situation.

Is that right, Mr. de Blank?

I think the et al. includes some Bosch entity, but I can't recall off the top of my head.

THE COURT:  Let me put it to you this way, Mr. de Blank:  Do any of the six cases involve similar technology that's involved in this case?

MR. de BLANK:  To the best of my knowledge, none of the six cases involve remote patient monitoring.  The legal issues are obviously substantially related and, in many cases, identical.

THE COURT:  Okay.

MR. McDONALD:  And I guess that would be my final point on substantial relationship, Your Honor, that the position of Bosch Healthcare is that because we had done some prior work involving patents, that at that level that makes the

substantial relationship. And I don't think that's the right standard when you read the case law.

I think the practicality of that is that in this day and age almost every lawyer practices some form of specialization with their legal practice. I do patent litigation. Other people do employment law and things like that.

And if this commonality here that was the substantial relationship was really just at that level of you're doing the same type of law, that would basically mean that no lawyer could ever be adverse to a former client, ever, regardless of the factual subject matter, as long as they are still practicing in their area of specialty.

And I think that takes it too far, and I don't see the case law really supporting that. It really says we don't use this playbook approach that I think Bosch was trying to advocate.

Moreover, the plays are getting pretty old if the last lawsuit they brought with us was more than seven years ago.

IPRs didn't even exist until 2012. The playbook has changed a lot for everybody in patent litigation, and I just think that's much too abstract a level to talk about substantial relationship.

THE COURT: All right. I'm going to take the matter under submission once I receive the supplemental declaration, which -- let's see. Today is -- if you can get that to me by

next Wednesday.

MR. de BLANK:  I believe, Your Honor, the only impediment would be if Ms. Taylor is traveling or out of the country.  But I don't -- if that happens, I'll let you know.  I don't expect it to be.

THE COURT:  I assume she is available by email, text, or otherwise.

MR. de BLANK:  I will do my very best, Your Honor.

THE COURT:  I will set a June 4th deadline because I want to get the information.  I want to rule on this because we've got other stuff pending, obviously.

MR. de BLANK:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.  Appreciate it.

(At 2:46 p.m. the proceedings were adjourned.)

-  -  -  -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, June 3, 2014

*Katherine Sullivan*

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter