**Pages 1 – 54**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE**

| | |
|---|---|
| ROBERT BOSCH HEALTHCARE SYSTEMS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | NO. C 14–01575–EMC |
| ) | |
| CARDIOCOM, LLC, ET AL., ) | |
| ) | San Francisco, California |
| Defendants. ) | Thursday |
| ) | June 19, 2014 |
| _____) | 2:23 p.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**      ORRICK, HERRINGTON & SUTCLIFFE, LLP
                        1000 Marsh Road
                        Menlo Park, California  94025–1015
                   BY:  BAS DE BLANK, ESQ.
                        SIDDHARTHA M. VENKATESAN, ESQ.

**For Defendant CardioCom:**
                        MERCHANT & GOULD
                        3200 IDS Center
                        80 South Eighth Street
                        Minneapolis, Minnesota  55402–2215
                   BY:  DANIEL W. MCDONALD, ESQ.
                        and
                        KIRKLAND & ELLIS, LLP
                        333 south Hope Street
                        Los Angeles, California  90071
                   BY:  TIMOTHY G. MAJORS, ESQ.

**Also Present:**       CHAD A. HANSON, Ph.D., Esq.

**Reported by:**        BELLE BALL, CSR #8785, RMR, CRR
                        Official Reporter, U.S. District Court

**THURSDAY, JUNE 19, 2014**                                        **2:23 P.M.**

**P R O C E E D I N G S**

**THE CLERK:** Calling Case C-14-1575, Robert Bosch Healthcare versus CardioCom. Counsel, please come to the podium and state your names for the Record.

**MR. DE BLANK:** Good afternoon, Your Honor. Bas De Blank for Bosch Healthcare.

**THE COURT:** All right. Thank you.

**MR. DE BLANK:** And with me is Sid Venkatesan.

**THE COURT:** All right.

**MR. VENKATESAN:** Good afternoon, Your Honor.

**THE COURT:** Good afternoon, Mr. Venkatesan.

**MR. MCDONALD:** Good afternoon, Your Honor. Dan McDonald here again for CardioCom.

**THE COURT:** All right, thank you, Mr. McDonald.

**MR. MAJORS:** Good afternoon, Your Honor, Tim Majors from Kirkland & Ellis for CardioCom.

**THE COURT:** All right, thank you Mr. Majors.

**MR. MCDONALD:** We also have with us in this courtroom today in-house counsel Chad Hanson from Medtronic.

**THE COURT:** All right. Okay. So, we are on for Defendant's motion to stay, particularly in view of the IPR and reexamination proceedings that are at play here. And I guess, given the fact that we've got now in IPR proceedings at least four out of the six patents, with many of the claims

being overlapping with the claims at issue in this suit, never mind the pending petition for IPR reexamination on the other two patents which were denied in the first round in terms of IPR proceedings.

Nonetheless, I'm not sure why it doesn't make sense to stay the matter.

MR. DE BLANK:  May I respond, Your Honor?

THE COURT:  Yeah.

MR. DE BLANK:  Thank you.

It does not make sense to stay the matter because of the tremendous prejudice a stay is going to cause to Bosch, the Plaintiff in this case.

And because the IPR is certainly not going to result in streamlining the case, it's not resolving the kind of benefit that the Court could hope or could look for, and because the case is at a relatively advanced stage of the litigation, I mean, CardioCom waited over 13 months before filing the motion to stay, discovery of the infringement contentions and validity contentions are done, a large part of claim construction has been exchanged.  And, because a lot of the discovery has already been completed.  There's no efficiency.

And if I could, Your Honor --

THE COURT:  We haven't gotten to claim construction yet.  There's been an exchange of preliminary claim construction -- there's been no briefing, right?

MR. DE BLANK:  That's correct, Your Honor.

THE COURT:  All right.

MR. DE BLANK:  But there has, Your Honor, been a new development this morning, if I could.

THE COURT:  Yeah.

MR. DE BLANK:  This morning, the patent office rejected another one of CardioCom's pending IPR petitions. This was on the '469 patent.

THE COURT:  Okay hold on let me get to my chart here.

MR. DE BLANK:  Uh-huh.

THE COURT:  Okay, on the '469, what has happened?

MR. DE BLANK:  The -- this was the first of the second round of IPR petitions that CardioCom had filed.

THE COURT:  Yeah.

MR. DE BLANK:  And the patent office this morning rejected that petition, again, on those claims, many of which are asserted.

THE COURT:  Which claims?

MR. DE BLANK:  On all claims.  They petitioned on all claims of the '469, and the patent office rejected on all those claims.  There were --

THE COURT:  What happened to 1, 2, 5 through 10?

MR. DE BLANK:  Yes.

THE COURT:  Those are still in play?

MR. DE BLANK:  Yes, Your Honor, so there are claims

that were in the -- sorry, in the first IPR petition that CardioCom filed.  The patent office accepted the IPR on certain claims, and rejected it on, I believe, the majority of the claims.  CardioCom -- that IPR is proceeding.

THE COURT:  Right.

MR. DE BLANK:  CardioCom filed a new IPR on the other claims, on all the claims.

THE COURT:  Why he.

MR. DE BLANK:  Including the claims that are asserted in this litigation.

THE COURT:  Yes.

MR. DE BLANK:  And the patent office rejected that IPR petition this morning.

THE COURT:  That's the second round.

MR. DE BLANK:  That's the second round.

THE COURT:  Yes.

MR. DE BLANK:  Indicative of --

(Reporter interruption)

MR. DE BLANK:  I apologize.

That is the first response in the second round.  And we think it's indicative of the -- the results the PTO is going to give.

It found that CardioCom's expert failed to show sufficient rationale to even meet the lower standard of invalidity in an IPR petition, than would be at issue in District Court.  And

that CardioCom had not addressed the patent office office's concerns when it rejected them in the first instance.

It also found that CardioCom -- it exercised discretion to reject the petition for the claim that had previously been raised, saying that there was no reason for it to go through a second round of IPR, a petition on these issues.

THE COURT:  All right.  But, as to Claims 1, 2, and 10, which are at issue in the case at bar, the '469, they remain at issue in the IPR.

MR. DE BLANK:  That's correct.  And Claims 5 through 9, which are also asserted, have now been -- once again the IPR's been rejected as well, because the deadline --

(Reporter interruption)

MR. DE BLANK:  Yes.  The IPR petition has been declined, and because the deadline for filing additional IPRs has passed, those claims will never be subject to an IPR in this case.  There will be no decision from the patent office, other than the decision saying CardioCom has not met its burden.

THE COURT:  Didn't -- I thought in the first round, the IPR was granted as to 5 through 10.

Am I wrong in that?

MR. DE BLANK:  No, I'm sorry, Your Honor.  You -- I misspoke.  You are correct.  In the first round, Claims 1, 2 and 5 through 10 were subject to IPR.

**THE COURT:**  Right.

**MR. DE BLANK:**  Many of those claims are not asserted in this case.  And many of the claims of the '469 patent that are asserted, such as Claims 11, 12, 13, 16, 17, 18, 19, 22 and 3, are not now and never will be subject to an IPR.

**THE COURT:**  Yeah.  No, I understand that.  There are actually only three claims that are in IPR that are in this case.  Namely, 1, 2, and 10 at this point.

**MR. DE BLANK:**  Yes, Your Honor.

**THE COURT:**  But, on the other hand, the claims that are asserted in here, I know they're not at issue, per se, but one of the values of the IPR process beside invalidity might be some insight into claim construction.

And there's certainly some possibility here that given the dependent claims and given the cross-referencing, et cetera, et cetera, that some construction, for instance, that may come out of Claims 1 and 2 may affect some of the other claims, even though they're not before the IPR for validity purposes.

**MR. DE BLANK:**  Some courts have found that.  But that's not at issue here, because CardioCom in their IPR petition specifically represented that the claim construction was only for purposes of the IPR.  And, doesn't apply to this litigation.

That's attached, we attached that as Exhibit 4 to the Ong declaration, the CardioCom petition, where they wrote

(As read):

"The following terms are construed as following for purposes of this inter partes review only."

They're trying to get one construction for purposes of the inter partes review, and not be bound by it. Not have it apply to the District Court.

**THE COURT:** Well, not be bound, but might it be useful to this Court?

**MR. DE BLANK:** No, Your Honor. It's a different claim construction standard. The patent office takes what's called the broadest reasonable construction. This Court will apply a narrower rer construction, a different construction that can lead to a different claim result. And in fact, that's why CardioCom has taken the position that what it says about the claims before the patent office only applies in the IPR proceeding.

And if I could add, Your Honor, of the -- there's only eight claim terms across all the IPRs that are even subject to construction under that different standard. CardioCom had initially identified 110 claim terms for purposes of construction in this Court.

The parties met and conferred and it's narrowed down to 35. And Bosch identified the five that we think are most relevant. But the idea --

**THE COURT:** So you are at how many claims that you

all agree to.

**MR. DE BLANK:**  Well we have identified five claim terms.  They initially identified 35 and then the parties -- we wanted to move forward on the claim construction briefing and CardioCom refused to participate.

**THE COURT:**  So that's where you are at right now, 35 and five?

**MR. DE BLANK:**  Yes.  But Your Honor, that's -- that shows both that there's a different standard that will apply in the claim construction so there's -- you are not going to get a benefit from the PTO's construction.

And secondly, even if you were to consider the PTO's construction, there's a small handful of terms that are even overlapping with what's at issue in the litigation.

**THE COURT:**  Have those terms been identified for IPR purposes?  You say there is a small overlap, so --

**MR. DE BLANK:**  Oh, sorry.  I meant there's only eight -- there are, I believe, eight claim terms that the PTO has construed as part of the IPR proceeding.

Of those eight, I am not sure even that all eight are on the list of 35 claim terms that the parties are currently disputing.  Some I believe relate to claims that are not asserted in the litigation, for example.  And the construction would be irrelevant to this case.

But my point is that at absolute best only eight terms,

any guidance will be provided and CardioCom itself has taken the position that that guidance has no bearing on this litigation.  It's a different claim construction standard.

THE COURT:  Just oh op that point let me hear your view.

MR. MCDONALD:  Your Honor as counsel pointed out the patent office used the broadest reasonable construction so it is different.  But I have had cases where had he are a reexam but they also used the broadest reasonable construction.  And I was the Defendant.

And we came in, after the reexam was over, some claims were canceled, a few were allowed, because of a specific claim construction the patent office adopted.  We've moved for summary judgment of noninfringement because we said whatever the scope is, it can't be broader than that reasonable construction at the patent office, and we don't even use it under that broad scope.

We won that; it was affirmed on appeal.  So, that's just one example of how this comes into play.  And it wasn't binding on us.  We could say as, Counsel indicated, this Court would typically use a narrower construction.  But it can tee up a dispositive motion very well.

And I just did it -- last July, I think the Federal Circuit affirmed that.

THE COURT:  So it might have some use.

MR. MCDONALD:  Absolutely.

THE COURT:  What about the number of actual claim terms that overlap between the IPR proceedings and had this case.

MR. MCDONALD:  Well I think a key point there is whether the terms are in dispute or not.  There's only one way it could be limited.

If some of those terms are certainly terms that are in claims that are at issue in the IPRs and if we are successful in validating those claims, a lot of those 35 terms are likely to go away because those claims go away.

THE COURT:  Okay so that is the bigger point, that a number of claims could end up being eliminated.  If you take the '192, for instance, all 37 claims, albeit on different grounds, are at issue.  And, it is potentially possible that the entire patent could be validated.

Wouldn't that streamline this case?  If that were to happen?

MR. DE BLANK:  It is a hypothetical possibility.  Because all claims in the '192 patent are at issue in the IPR.  A third of the asserted claims are not at issue in any IPR.  But for the example of the '192 patent --

(Reporter interruption)

MR. DE BLANK:  I apologize.  And, thank you for reminding me.

One of the factors the Court looks at to determine whether or not to stay a case is whether the IPR or a PTO proceeding is likely to streamline the case.  The hypothetical possibility that a claim may be canceled cannot by itself satisfy the that factor because it would render a nullity.

If the Court were to say in any case where an IPR has either been instituted or is even just pending there is a potential to streamline the case, that would read out the entire factor because by definition, that would always favor a stay.

Here, we have the strongest case where one can possibly have on this issue, where a number of CardioCom's petitions including the one this morning, the PTO reviewed and refuse odd to institute an IPR because CardioCom could not even meet that low burden.

And if you remember from CardioCom's opening motion, they, themselves, say the vast majority of IPRs statistically are granted.  That has not happened in this case.  A third of the claims are not subject to IPRs, and almost half the IPR petitions that the PTO has decided, they've refused in whole or in part.

**THE COURT:**  All right, but it also conversely suggests that two thirds of the claim, including all of those in the '420, all of those in the '192, have been found to be of sufficient weight to warrant going through the IPR process.

**MR. DE BLANK:**  That's correct.

**THE COURT:**  And as you know, many courts use that as the sort of the crucible at this point.  That if you've gone through not just the filing with the PTO, but some determination and some assessment that this is going forward, you know, that certainly is what many courts and maybe the trend is, at least with respect to those claims.

**MR. DE BLANK:**  That's correct, Your Honor.  You are correct, Your Honor, that for some of the other patents claims at issue are subject to the IPR.  We don't dispute that.

What we dispute is that overall, this factor -- factor -- these potential hypothetical simplification so far outweighs the clear prejudice, the unambiguous prejudice that Bosch will face because a stay will essentially mean that we will lose our ability to get an injunction, and as set forth in the declarations from the three different Bosch executives, Bosch is suffering irrepairable injury from its competitor CardioCom.

And also, the first factor, that CardioCom delayed over 13 months before even filing a motion to stay, which resulted in a significant amount of work being done in this case.  I believe over 2,500 hours in the litigation.  Not counting the IPRs, but Bosch has spent over 2,500 hours in the litigation between the filing of the complaint, and when CardioCom finally filed a motion to stay.

And, that is just a very different situation than the typical stay case where a defendant, where it's no it a competitor case, whether there's no prejudice and where a motion to stay is filed early on in the case.

THE COURT:  All right, what about that?  What about the waiting on the filing of the motion to stay?

MR. MCDONALD:  Your Honor, the issue as to our filing of the motion for stay wasn't about when, it was about where. This case was brought originally in Texas after they had brought had a case in California, on six closely related patents that, accusing the exact same products of infringement.

After I got a stay in the first case then they run to Texas where neither one of us has significant contacts, and we saw that was totally an inappropriate forum for this lawsuit.

So the first question at that point then is where should this thing be so that the proper decisions are made about administrative and substantive issues?  And we believe very strongly it should be right back here in the Northern District of California.

So immediately after they brought suit in Texas, we move to transfer the case to California.  Very quickly.  I believe, even before we answered the complaint, we moved on being -- the right where established.

Immediately after the right where was established -- that

was in March, the Texas court transferred; this Court got it in early April, we then immediately -- I think it was the day after the clerk in California said they've got the case, we filed a motion to relate this case to the earlier-filed one that was already stayed by Judge Davila.

Judge Davila denied the motion to relate on May 1st.  We filed the motion to stay on May 15th, in this court.  There was no delay.

THE COURT:  Well, but the petition to institute the IPR proceedings, first filed back in July of 2013.

MR. MCDONALD:  (Nods head)

THE COURT:  And, the petitions on the four, four patents were granted, in part, in January of this year.  And, when was this motion filed?  Motion to stay?

MR. MCDONALD:  May 15th.

THE COURT:  May 15th?

MR. MCDONALD:  May 15th.

THE COURT:  I could see an argument why you wouldn't file before there is a decision by the PTO to institute that just filing doesn't do it.

So I guess the real delay, if we're talking about delay, arguably, would be from the date of the -- of the decision to allow the four patents to go forward, or at least some of the patent claims go forward in the IPR, instituted IPR, which occurred in January, right?

**MR. MCDONALD:** Right. Those decisions came in in January.

**THE COURT:** So, and May, so one would could argue there was a four-month delay.

**MR. MCDONALD:** But on that issue, Your Honor, that's exactly how Bosch was trying to set it up, to tactically put us between a rock and hard place, because they brought this case in the first place in the wrong place, and then, forcing us into this dilemma. But we felt confident that the Court would agree with us that this California court was the right forum for the case.

And part of the issue of getting a case transferred to the right forum is to make decisions exactly like this one: Should the case be stayed?

And, Bosch had an improper forum. And they would be benefiting from that if we were forced to file this motion while our motion to transfer was still pending in Texas, when that was the wrong venue.

**THE COURT:** All right. Well, let me ask you this. Let me go to another point. Right now, at least two of the patents, the '605 and the '249, IPR's been denied, and I understand there's a reexamination request, which carries less weight in my mind.

What about the feasibility of allowing some aspect of this case to go forward, and not others? Is there a problem with

allowing some litigation on the '605, the '249 and perhaps on some of the claims of the others that are not under review?

MR. MCDONALD: Well, I think, Your Honor, that would be a very inefficient way of handling things. It would be one thing if they had some of these patents were accusing our Model No. 101, and other ones were accusing the Model 102 and things like that.

But, all of these accusations go to our same product suite of products here, having to do with the healthcare monitoring. There might be a little tweak here and there on the dependent claim, but these core products of ours, like our --

(Reporter interruption)

MR. MCDONALD: Sure.

We have a few products. Our core products are the COMMANDER FLEX at the remote location, for example. And the OMNIVISOR is the nurse work station. Those are essentially at issue with all of these, number one.

Number two, the ones that are in IPR, granted, versus the ones that aren't, have a lot of similarities. The '420 is one of the ones where all claims are in IPR. The '605 is one where all the claims were not in IPR.

But, those two have to do with these group overview checks. The diagrams on the first page are identical. The whole file history, in terms of the provision on other applications are very, very similar. A lot of the claim

terminology is the same.  It just doesn't make sense to litigate the one without the other.

Similarly, with the other ones, the '249 and '469, those families also start with the same original grandparents, great-grandparents, as the '186 and the '192.  And of course with the '469, you're even splitting the baby there, with some in IPR and some aren't.

In all of those cases you have essentially the same products being accused, many of the same claim terms at issue, much of the same prosecution history at issue, the same marketplace issues at issue.  And it just doesn't make sense to do it once, and then do it again in a slightly different way.  It's just a very inefficient way of doing things.

And that's consistent with a lot of the case law out there that says every patent doesn't have to be into reexam for the IPR in order for the stay of the entire case to make sense.

I will note that a lot of the case law that both sides cited, and necessarily so, were in the context of the old inter partes reexam.  Even some ex parte reexam.

Of course, now which have more of this about the inter partes review process.  And it's certainly a more compelling case now.  That process was basically designed by Congress in large part to make it much more appealing for the Court to stay a case, pending the outcome of the IPRs.  They're better than the reexams from that standpoint primarily because they

are so much faster.

Some of the case law that Bosch cited refers to an average reexam will take about three years, and then after that -- that's only round one.  That's the patent office.  In the old days, with the inter partes reexam, you had a right to appeal to the Patent Board of Appeals.  And then if you didn't like that, you could appeal to the Federal Circuit.  So you add all that up, that would be six years.

Well, now with the IPRs, you've got the 18 months from filing, 12 months from institution.  You're right to the board.  And so you only have one appeal left in the Federal Circuit.  Maybe that takes about a year and a half or so.  You've essentially cut everything in half.

So all of those cases that indicated that even if only some of the reexams -- patents are in reexam, that justifies a stays of the whole case, I think they apply with even greater force here.

**THE COURT:**  What about the problem of potential irreparable injury here?

Given that you're in a competitor situation, you say that there's been -- a certain aggressive licensing program shows that it's about the money more than it is about keeping technology to itself.

But, what evidence is there that with respect to these patents -- these six that are at issue here, not the ones

before Judge Davila -- that there's been some kind of licensing program?

MR. MCDONALD:  Right.  I think Bosch's papers give the impression that their licensing program didn't include these.  But I have two pieces of evidence on that.  One is in Schultz Exhibit L.  It is a press release from Bosch from April 30th, 2012, regarding the Waldo Health license.  And that one refers to (As read):

"The first licensees of Bosch's extensive telehealth patent portfolio, which consists of more than 145 issues of issued U.S. patents, and more than 60 U.S. patent applications and foreign equivalents."

And that would include the patents in this suit.  I mean, it --

THE COURT:  How do you know that?

MR. MCDONALD:  Well, they only had 145 patents, and these six patents all had issued by 2012.  There aren't more patents to add to get to 145.  It had to include that.  And plus, they had all these applications.  That's a very non-exclusive statement.

The other piece of evidence I have, it's not out in the record, but I went back and getting ready for the hearing.  We don't have all the license agreements from the initial round of documentary production, but we got one settlement agreement that also includes the patent license.  And that's the one

from 2010 with Alere, A-L-E-R-E.  And --

**THE COURT:**  When was this?

**MR. MCDONALD:**  It's dated May of 2010.  And it's Production No. 12328.  I'll note that this is attorneys' eyes only, Your Honor, so I'll try to avoid getting into the details of this.

But, they have a settlement agreement.  And we got some of those, but they always refer -- or many times, anyway, refer to a license agreement.  Well, this is the one we actually got the license agreement for (Indicating).

And if I can use the ELMO, is that available right now?

**THE CLERK:**  Um --

**MR. MCDONALD:**  Maybe not.  I can just --

**THE CLERK:**  (Inaudible)

**THE COURT:**  She may be able to.

**THE CLERK:**  Yeah, go ahead and --

**MR. DE BLANK:**  Your Honor, if it -- if it's attorneys' eyes only, is your representative authorized --

**MR. MCDONALD:**  Mr. Hanson is.

**MR. DE BLANK:**  Okay.

**MR. MCDONALD:**  And, I have something on the protective order, yes.

I can just explain it, though, Your Honor.  But --

**THE COURT:**  Well, we have the ELMO up, if you want to use it.

(Reporter interruption)

(Document displayed)

**THE COURT:** You've got to repoint that thing.

(Document displayed)

**MR. MCDONALD:** Okay, so this is the first page, Your Honor.

Settlement agreement, May, 2010, with Health Hero Network, at the time. That's the predecessor company. And then you see -- also Robert Bosch North America, and then Alere. So, these are the parties to this.

And then, I apologize if this gets a little disruptive as I thumb through the pages here.

(Document displayed)

**MR. MCDONALD:** But what we have in the back here is the license agreement that was part of the settlement. And it refers to the HHN or Health Hero Network portfolio.

And you see the highlighting there. It talks about the list in Exhibit D, which would be applications you have -- filed as a continuation or continuation in part of the applications listed in Exhibit D.

All right? So then the question, of course, is: What's in Exhibit D?

And then what's in Exhibit D --

(Document displayed)

**MR. MCDONALD:** It has two lists. This is the first

page up here.  You can see issued patents.  '192 (Indicating).  That's one of the ones in this case.  '469 (Indicating).  Also in this case.

But -- and we've got some highlighted from the first case here, as well (Indicating).  But those are the two relevant, here.

What about the other four patents?

(Document displayed)

**MR. MCDONALD:**  Well, now we turn to the abandoned and provisional U.S. applications.  Here's the Application No. 09/880735 (Indicating).  And I wrote the two patents.  That's the '420 and the '605.  Those are the group overview chart patents.  They all come -- they both come off of that application.  It's right on the cover of the patent (Indicating).

How about the other two patents, the '186 and the '249?  They both come off of -- I think it's both of these two numbers here, 60/041746 and 60/041751 (Indicating).

(Document taken off display)

**MR. MCDONALD:**  So those are the specifics, Your Honor.  I'll also make the general comment that if you're a party that's talking to Health Hero or Bosch about a license and they've got all these patents that cover telehealth devices, it really wouldn't be typically very rational for them to say "I'll take a license under some of your patents

but I know you have got other issued and pending ones.  You can sue me on those."

The whole point of taking the license is to not be sued.  So it would be pretty exceptional here, in a situation like this, for Bosch to keep some of the -- the arrows in its quiver here to shoot at these licensees, because that's the point.

And, the primary thing there is, though, Bosch should have been the one coming forward with this, if they were really trying to say they didn't license this (Indicating).  There's no evidence at all that these patents were excluded from the licenses.  But the business reality is nobody would ever do that.

There's also no exclusion of any particular market in the license agreement.  There's nothing that says you can't tell sell to the Veterans Administration.  There's nothing in their public press releases where they tout the fact that they wanted to have what they call an "active technology licensing program" to spread this technology around.

They don't put in there an exception that says, "Oh, except we don't want the technology to be widely available for U.S. veterans." and I don't expect they're going to be coming out with a press release like that any time soon.

So, clearly, what's at issue -- the licensing that's been going on here is very directly pertinent and defuses in

substantial part their claims of prejudice.

I would like to kind of go through a brief history on that issue as well, Your Honor, just to show how all of Bosch's activities are consistent with them thinking that compensation or monetary compensation is adequate here.  They never have treated this market like it was one where they were going to get injunctions or market exclusivity.

This goes back to 2006 when we first contacted CardioCom about a license and they said no.  And they knew at the time we were a competitor.  They did nothing.  Sat on their hands.  They didn't try to stop us from competing with them.

Fast-forward a little bit to 2011.  That is when the Veterans Administration now grants some of these contracts to competitors of Bosch, including CardioCom, and four other companies.  At the time Bosch was litigating with some companies but they didn't go after CardioCom.  And, they in fact had had -- that is in April of 2012 is the date of their press release where they tout the fact that in 2011, that's when they initiated this active technology licensing program.

So here we are, they say the VA is their biggest customer, that's the biggest deal.  It's two thirds of their market. They now have five competitors that just walked right in on that competitor (sic).  And what did they do?  They didn't do anything, to us.  They did to some other folks.

But in 2012, then, they sue us.  But you might remember

from some of the other motions, they didn't even contact us in 2012.  We contacted them first because our president of CardioCom heard from an ex-president of Bosch that they were probably going to be talking to CardioCom about a license and we might want to go talk to them first.

And this all came about, that is when they dropped the complaint on us when we went to Palo Alto to go out to have that preemptive meeting.

THE COURT:  The discussions back in 2006, they included these license -- these patents?

MR. MCDONALD:  Well, those patents wouldn't have issued yet, but they would have all had -- those serial numbers that I showed you from that license agreement?  Those were all existing back then.  These patents actually have the filing dates that go all the way back to 1996 and 1997.

THE COURT:  When were they issued?

MR. MCDONALD:  Between 2009 and 2011.  So we have the 2012 lawsuit then, finally comes along, and they sue us in that one.  But like I just said, all these six patents already existed in 2012.

Are they worried about irrepairable harm because of us using those other six patents?  Well, if they were worried about it, they did absolutely nothing about it, because they didn't even include them in the 2012 lawsuit.

That -- that goes along.  We get the stay in late 2012.

Even then, they wait several more months to bring a lawsuit in a distant forum that they knew was very likely to be contested, that could result in further delay of this case.

So, all of these actions are of their making.  They don't seek a preliminary injunction at any point, from us or anybody else.  They brought up the VA activity when they opposed our motion for stay.  They -- they were aware of it.  There's no doubt they were aware of it.  Supposedly, their biggest customer.

Yet, they did nothing that was consistent with any irrepairable harm going on, until we come along and we move for a stay here in 2014.

Just, A, it doesn't add up, and B, it -- their actions just speak a lot louder than their words.

**THE COURT:**  Right.  So what you're saying is that the delay, if anything, is on Bosch's part.

**MR. MCDONALD:**  Absolutely.  And --

**THE COURT:**  And that belies any claim of irrepairable injury that threatens their competitive existence because they knew about your VA activity at the time that the last patent was issued, or close to thereabouts in 2011; some of the patents issued in 2009, no action.

**MR. MCDONALD:**  (Nods head)

**THE COURT:**  First lawsuit brought before Judge Davila, not at play there.

**MR. MCDONALD:** (Nods head)

**THE COURT:** And no suit until this suit was filed in April of 2013 in the Eastern District of Texas.

**MR. MCDONALD:** Exactly. And in Judge Davila's decision granting us the stay in the first case, he's got some analysis right on this point. And he says there isn't a showing of irreparable harm because Bosch's situation is of its own making.

And that is a fact that Bosch -- a finding that Bosch did not appeal. And it's very apropos here, Your Honor, if anything, with even greater force because the delays have been even greater.

**THE COURT:** All right. What's your response?

**MR. DE BLANK:** Okay. Thank Your Honor.

A couple of different points. First, the settlement agreement that Mr. McDonald showed the Court is a settlement agreement. It was an agreement entered to settle litigation. The idea that Bosch is not allowed to resolve the litigation it brings on favorable terms, and that if it does settle, it is suddenly no longer allowed to get an injunction is simply not correct law.

Secondly, as set forth in the Bachmann declaration, it explains the irreparable harm that CardioCom is causing Bosch, and explains how that has happened recently. Bosch has for a time been selling to the VA. Bosch at one point had the

vast majority of that market share.  And if you look at Paragraph 9 of that declaration, you can see that starting in May, 2011, CardioCom entered the VA.  At zero percent at that point.  Bosch had 73.

And then over the course of the next couple of years, CardioCom's infringing sales have taken -- have come directly out of Bosch's sales.  CardioCom has gone from zero to approximately 60 percent, and Bosch has gone down accordingly. That is the irrepairable injury.

Bosch has not -- there are only five companies that are allowed to sell products to the VA.  This is an important market to Bosch and Bosch has not licensed any of those companies.

When it became clear that CardioCom was causing irrepairable injury to Bosch, Bosch sought to enforce its rights.  It sued CardioCom in the first case.  That case was stayed.

However, CardioCom did not stop infringing.  It didn't change its products, it doesn't take advantage of the stay to do anything that would mitigate the irrepairable injury it is causing to Bosch.  So Bosch sued them again.  That is -- Bosch could not do more to try to stop CardioCom from causing the irrepairable injury than Bosch has already done.

The declarations are uncontested on this point, that Bosch has lost mark share to CardioCom, and --

**THE COURT:**  So why aren't damages an adequate remedy?

**MR. DE BLANK:**  Because Bosch should be allowed to exclude CardioCom.  As the declarations explain and as set forth in the reply, there is a lock-in effect for these sales.  And once a patient or once a provider becomes used to a certain customer's -- a certain company's products and has invested in the IT infrastructure that would support it, it becomes very difficult to displace them.

And what CardioCom wants to do is to deny Bosch even the possibility of getting an injunction, by staying this case until after the patents expire.

If CardioCom's stay is granted, these patents will expire before Bosch is able to prove that CardioCom infringes.  And at that point, the CardioCom systems will be locked in, as set forth in the declarations, and Bosch will be permanently and irreparably damaged.  And that really is the key issue.

There is the hypothetical possibility that some of the claims -- it can't be all the claims.  We know it can't be all the claims, because some claims are not now and never will be subject to IPR.  But, there's a possibility that some claims may be canceled.

And you're weighing that against the absolute certainty that a stay will prevent Bosch from exercising its right to exclude its direct competitor, CardioCom, from its primary market.  And that's simply unfair.

THE COURT: How much longer do the patents have?

MR. DE BLANK: The patents will expire between 2016 and 2017. So, according to Mr. McDonald, after the IPR decisions are done, between January and six months after that, or so, there would be a one-and-a-half-year period where CardioCom would appeal the adverse decision from the patent office. And only at that point would the case go forward.

THE COURT: So the exclusion period that you would be denied as a result of a stay is one that would last anywhere from one to two years?

MR. DE BLANK: Yes, Your Honor. From the entry of the injunction through the expiration of the patents.

THE COURT: And, or maybe two to three years. So doesn't that suggest that damages would be calculable?

I mean, the longer the period, the value of the injunction that you would get -- you wouldn't -- I mean you wouldn't get it for a year here anyway, the way -- actually if you took at the statistic it would be about two years probably but will it will be 18 months -- so now we're talking about we go to trial, at some point assuming no summary judgment, no stay. We're probably talking about the end of 2015.

MR. DE BLANK: Uh-huh.

THE COURT: You win, you get an injunction. So you get six months' worth, 18 months' worth, not -- I'm not belittling that, but that is a lot more quantifiable than an

injunction that would be effective through a patent that would go on for another eight years or nine years where the economists have to come in and make all sorts of suppositions. So why aren't damages adequate?  That's my question.

If, in fact, you are being deprived of your share of the VA market because of this infringing activity, you have got a pretty good chart here, and you will be able to chart that out through the end of the patent which is another two years, two more tables there.

**MR. DE BLANK:**  May I respond, Your Honor?

**THE COURT:**  Yeah.

**MR. DE BLANK:**  Well, that's set forth in the uncontested declarations, there's -- let me be clear.  There's been no dispute on this point.

But, for example, in Tim Conroy's declaration -- he's vice-president of sales and account management at Bosch -- Paragraph 10, he explains what is called the lock-in effect.

So, for example, CardioCom, absent an injunction CardioCom will be able to sell its products, the infringing products from today through the entire life of the patents, and beyond. Once it makes these sales to these particular VA institutions, to these doctors and to these companies, those companies are locked in to buying further devices from CardioCom.

And that is because they have invested in training, working with those devices and the IT infrastructure necessary

to use those.

At that point, it becomes very difficult for Bosch to displace CardioCom from those accounts.  And --

**THE COURT:**  What happened to the lock-in effect that presumably you had the benefit of in May of 2011 when you had 73 percent of the market?

Something happened in three years where you went down to 34 percent.  What happened to the lock-in effect?

**MR. DE BLANK:**  The answer, Your Honor, is that CardioCom infringed our patents and used exactly the same features, exactly the same --

**THE COURT:**  But it shows the lock-in effect is not so locked in.  People can breach that lock, it sounds like.  I'm looking at it right here, at your Paragraph 9.

**MR. DE BLANK:**  Sorry, Your Honor.  Let me be clear.  There is a difference between a lock-in for an existing account and that account growing, and new accounts coming in.

So, as the market -- this is a relatively new market, which is why these patents are so important.  As the market expands, CardioCom sales can grow and Bosch's can go down.

Now, a particular account, however, just as an example, say, CardioCom wins a contract for the VA in Tulsa, Oklahoma.  Once that VA account has decided to use CardioCom, it will use more and more and more of those CardioCom --

**THE COURT:**  You are suggesting that Bosch hasn't

really lost any accounts; it's that CardioCom grew and got the benefits of all the growth in the VA market, in the market.

MR. DE BLANK:  Well, it lost these accounts to CardioCom because Bosch presumably, before CardioCom gang infringing was averaging about 73 percent of the market.  And that would have continued absent the infringing competition.

THE COURT:  Yeah, which begs the question I just asked, and that is if you actually lost accounts, notwithstanding -- because what you haven't shown here is the total pie.  The total pie has grown.  You've only shown a percent of the pie.

But assuming that you've actually lost -- a net loss of accounts from May, 2011, to April, 2014, I assume you would say that, I assume that's part of your damages calculus.  When you go from 73 percent to 34 percent, unless the total pie tripled or quadrupled, you probably lost some accounts.

MR. DE BLANK:  I --

THE COURT:  So my question, is, well, weren't you able -- you say the lock-in effect.  The same benefit you had back then -- training, infrastructure, people getting used to it, familiarity -- apparently it is not so locked.

MR. DE BLANK:  I think, Your Honor, the pie has grown.  Both parties have explained in their brief that this is an emerging market where the VA has a pool of $250 million that it is going to award over the next five years so the pie,

itself, is growing.  I agree that there probably are specific accounts where CardioCom has taken sales that Bosch had previously made.

I'm not contesting -- I don't mean to suggest that the lock-in is some sort of contractual obligation, or that there's no way a customer can switch.  Obviously, it can.

But what I am saying is that by denying Bosch the possibility of getting an injunction, you are allowing CardioCom to continue its infringement for a period of time that Bosch should be allowed to exclude them, after -- between -- after -- when we prove their infringement and the expiration of the patents, and CardioCom will use that time to expand its market share in a way that is not compensable by damages, because those sales will continue past the expiration of the patents.

So, for example, if in 2016 after Bosch -- sorry, when Bosch would have proved infringement, if a stay has been entered, then CardioCom will be able to continue selling those products.  And it will sell products to companies that will buy them in 2018, 2019, 2020, after the expiration of the patents.

Now, if the stay is denied, Bosch should get a verdict hopefully sooner, but by 2016, that would allow it to get an injunction and prevent CardioCom from making those sales.  And then Bosch will reap the rewards of its own technology, and

make those sales to customers in the future.  That's the irrepairable harm that Bosch is facing.

THE COURT:  That's interesting.  So damages -- if the a patent expires in 2016, even if you could prove a lock-in effect and residual effect be that continues to persist after the end of the patent, you have no monetary -- that can't be claimed as a consequential damage.

MR. DE BLANK:  I certainly would expect CardioCom to argue that he need not pay damages past the expiration of the patents.  Even though those sales --

THE COURT:  You would concede that?

MR. DE BLANK:  Well, Your Honor, if you enter a stay then no, we're certainly going to say that the only reason they made these sales is because of what happened.

(Laughter)

MR. DE BLANK:  But I think that would be a difficult point, frankly.

THE COURT:  All right.

MR. DE BLANK:  And it's one that we shouldn't have to face.

THE COURT:  So, why wouldn't everything you are saying be true in virtually every competitor case?

It's almost true in every competitor case that somebody's going to be losing sales to their competitor because of an infringing product, and therefore we should never enter a stay

because there's irreparable harm, even if all six were in IPR, all claims.  The irreparable harm is just especially with competitors so compelling, we should -- we are denying the patentholder its day in court.

MR. DE BLANK:  Well, Your Honor, I would first argue that in competitor cases and then -- and the case law supports this -- and Your Honor, in your decision, *Asetek Holdings versus Coolit Systems*, you recognize that the effects between direct competitors would be difficult to reverse after the fact.

So, I think competitor cases absolutely are different.  But this is even more different than most competitor cases for two reasons.  First, it is not a fungible widget that we are talking about, it is not a type of screw or a carton of milk where somebody might buy whatever happens to be cheapest on the shelf.

The undisputed evidence -- again, this is simply undisputed -- is that there is a lock-in effect that would prevent Bosch from being able to compete directly or to recoup all of the sales that CardioCom would make during the period that they should be enjoined.

And secondly, because these patents are expiring, that there isn't an opportunity for Bosch to get an injunction after the stay is lifted, after the PTO confirms the claims and the case proceeds to litigation.

And it's -- just, again, I don't mean to belabor this point. But it's absolutely unequivocally true that the IPRs will not and cannot dispose of all the claims in this case, because a third of them aren't even subject to IPR, and a fair number of the claims of the '469 will never be subject to an IPR.

THE COURT: All right. What about that? That this is a special competitor?

Not only is this a competitor case, this is one where the right to obtain an injunction is likely to be lost forever, if the stay is granted. Given the expiration, I mean, it's the almost the flip now.

Rather than saying your damages are not, you know, measurable because there's not that much time left, his argument is that it's exactly because of the limited time fuse that is left that we need judicial relief now.

MR. MCDONALD: Well, Your Honor, I think they are kind of making lemonade out of lemons here.

The only reason there is going to be such a small window left is because of all of that delay that goes all the way back to 2006 in some respects and certainly since the day of the patents -- these issued in 2009s and forward, in other respects, that's -- the fact that they have not treated this market as one where they even wanted exclusivity. That's the reason why it is going to be such a small window. It's got

nothing to do with us, number one.

I do think you hit the nail on the head of the stickiness issue of the customers, the fact that the market share did flip over and they don't show any specifics they have a conclusory affidavit that talks about the concept but you have asked the hard fact questions that Bosch hasn't an answered on the Record or today about, well, what actually happened there with those supposedly sticky VA customers that you had beginning in 2011 when you dominated the market back then, if everything is so sticky, the facts that they have presented refute that.

And I'm a little confused here as to what they're actually shooting for.  Because when you play it out as Your Honor did a few moments ago, best case scenario for them, If we ignore all of their failures to seek preliminary injunctions, the fact that they have licensed multiple competitors, the fact that even at the VA there are four other competitors out there, and if they stay us there is no proof at all that Bosch will get back one of those sales as opposed to those other four competitors.  They've done nothing to deal with the rest of the market.  The elephant in the room for them.

You put all that aside, and you still get to the point of, okay, maybe they get an injunction at the end of 2015.  What irreparable harm are they trying to stop at the end of 2015?  What's that injunction going to do then?

I hope they're not suggesting that the Court is going to do something that's extremely rare in patent cases, let alone in health-rated cases, where you not only enjoin them but you're going to go rip out the products that are in a veteran's house?

I don't think we're talking about a retroactive injunction, right?  It's going to be "CardioCom, you can't do it any more."  Well we have already got a big part of the market, according to them, now.

And the trend would be we're going to have at least as big a part of the market at the end of 2015.  If it's 80/20 and they get an injunction then, what irrepairable harm are we actually stopping for that 12-month period?  You --

**THE COURT:**  Raises the question:  How long would an injunction last?  You say damages are doubtful beyond the expiration date of the patent.

Could I issue an injunction if we got to that point, that goes in at 2018, 2019, if you don't have patent any more?

**MR. DE BLANK:**  I think CardioCom would have a strong argument that the injunction should not extend beyond the expiration of the patent.  There might be equitable considerations --

(Reporter interruption)

**MR. DE BLANK:**  There may be some equitable considerations and there may be some possibility, but

typically in patent cases an injunction does not extend beyond the end of the patent.

**THE COURT:** So again, to the extent that you're -- so what you're being deprived of is an injunction probably lasting a year, at most?

**MR. MCDONALD:** That would be extremely disruptive to CardioCom, because then you're telling us we have to stop doing this or redesign our product, if it already doesn't infringe.

But in 12 months, we can go back, doing what we were doing before again. I mean, really, when you look at the balance of everything, yeah, we're competitors. That's one little gram of weight on that side of the scale for an injunction. But almost every other factor goes against an injunction in this case.

And that's even before we get to the issue of the VA, Your Honor, which is we have conspicuously not talked about the en limine issue that had a little flurry of activity here. And I don't know how much you want to get into it.

But, the bottom line is the government giveth and the government can taketh away. The government grants you a U.S. patent. Part of the deal then is you have to let them use your technology. You may have to pay them, but you can't stop them. You can't get an injunction against the government, who gave you that patent in the first place.

Case 3:14-cv-01575-EMC   Document 148   Filed 07/25/14   Page 42 of 55   42

And that's kind of the -- the cannonball here against all of these factors weighing on the scale.  They can't even get an injunction against this customer that they say is the most important one.

MR. DE BLANK:  Your Honor, may I respond to your question?

THE COURT:  Yeah.

MR. DE BLANK:  Thank you.  You asked what was the purpose of the injunction.  How would a year injunction help Bosch.  And the answer I think came from Mr. McDonald's mouth.

What he said is that they intend to keep selling to the VA, keep selling to these hospitals and to these customers for as long as possible.  And he said that they hope to get to 80 percent, which would be roughly 50 percent more than they have now, by the time that Bosch proves infringement.

And then he says:  Ah, but now they're up to 80 percent; you can't take those devices away from us.

That's exactly the harm.  They want to use -- they want to sell infringing products for as long as possible.  And then when we finally prove infringement, when we're finally entitled to our day in court, which is the only thing we've ever been seeking, they want to say: Ah, but now you can't get an injunction because it would disrupt us and because we have used this time to sell to so many customers that it would be unfair for your to get an injunction."

Official Reporter – U.S. District Court
(415) 373-2529

**THE COURT:** Well, that's just his argument at this point.

**MR. DE BLANK:** Yes.

**THE COURT:** You know, I think his argument is that there's a good chance that you wouldn't get a the injunction at all, anyway. And so, therefore, the balance of hardships, is your hardship is an illusory one.

I'm not saying I agree with that. I'm just saying that's -- that's just an argument.

Your main point is that you are entitled to at least argue for an injunction, and you're losing your chance to get the injunction.

And my concern with that is that, well, even if you were deprived of that opportunity to get an injunction, and assuming for a moment, arguendo, you did get that injunction, I'm not sure how irrepairable and how much of a hardship that is since it would probably be a short-lived injunction.

**MR. DE BLANK:** Your Honor, all I can say is that we have submitted three declarations from three separate executives, explaining exactly that. That a stay of this litigation would be extremely harmful to Bosch. That is Paragraph 11 of Klaus Bachmann's declaration.

(Reporter interruption)

**MR. DE BLANK:** Tim Conroy explains that almost 100 percent of the customers Bosch has lost have switched to

CardioCom.  That Bosch is heavily impacted by the continued competition, and that Bosch would be harmed by a stay of this injunction.  William Broderick says essentially the same things.

This is uncontested, uncontroverted evidence.  It is the only evidence on this point, establishing that Bosch will be irreparably harmed by denying the opportunity to seek an injunction.

Now, in balance against that, the only factor weighing in favor of a stay because a significant time has already passed in the litigation, significant work has already been done, is the possibility that some, but not all, claims might be canceled.

That's the only factor, a hypothetical benefit that could result.  And you have to weigh that against --

THE COURT:  From patents.

MR. DE BLANK:  Some --

THE COURT:  Well, some claims, yeah.

MR. DE BLANK:  Against the unequivocal, undisputed enact a stay would extend the case past the expiration of the injunction, and 100 percent guaranteed, preclude us from effect seeking the injunction we believe we're entitled to.

THE COURT:  What's your view of the feasibility or advisability of splitting this up?

MR. DE BLANK:  Well, Your Honor, I think between

getting a stay and splitting it up, obviously splitting it up is the best answer.

THE COURT:  Something is better than nothing.

MR. DE BLANK:  And fundamentally, there's absolutely no reason to stay the claims that are not subject to an IPR.

The only argument that could possibly be made in favor of staying those claims also is:  Well, they are so related to the other claims that we should stay everything.

THE COURT:  Right.

MR. DE BLANK:  Well, Your Honor, the answer to that is if the claims that are subject to the IPR are so related to the claims where the patent office said that there is no chance that CardioCom could prove invalidity, then -- sorry. Let me -- I'm sorry.

If the claims were as related as CardioCom suggests, they would not have had to rely on different prior art for different claims of the same patent.  The patent office would not have reached different conclusions.  They would not be arguing for different claim construction of exactly the same claim term, "Script program," in different IPR proceedings.

They are completely -- these is are separate patents. They are related.  They have common specifications, and some common figures.  But they have different claims, with different claim elements, for which different products are accused.

And, proceeding on the claims that are not subject to an IPR is vastly preferable that --

**THE COURT:**  How much duplication would there be if this case were severed up?  Severed?  And, and we proceeded with the '605 and the '249, for instance, and not the others?

Would there be duplication in having two sets of claim construction, two sets of summary-judgment motions, two trials?

**MR. DE BLANK:**  I don't think there would be duplication Your Honor.  I mean, if we -- if we prove infringement in the first set of claims as we expect we will, we will seek an injunction.

If we get the injunction we think we are entitled to, then the infringing sales will stop and we can -- we will have received a royalty on the claims that we prove infringement --

**THE COURT:**  If you win on the '605 and the '269, no duplication.

**MR. DE BLANK:**  And the claims of the '469 where the patent office has denied IPR for the second time.  Yes.  Then there's no duplication.

**THE COURT:**  Okay.  What if you lose, and then you want to now pursue the second round in those claims that came out of -- let's say I survive, and you come out of IPR.  Is there going to be duplication then?

**MR. DE BLANK:**  I would think very little, Your Honor,

because if we were to lose, and the issues are as interrelated as CardioCom would have you believe, then I would expect them to file a summary-judgment motion, and Your Honor would consider it.

It seems that very difficult to see how there could be duplication, substantial duplication between these patents and that is exactly the point Judge Davila found when he denied their notice of relating the cases that these are patents in the same family, relating to the same type of product, but they have different claims, different claim terms, different accused features. They're different, different issues.

**THE COURT:** Well, on the other hand, you chose to join all these six claims in this action. Not in the Davila action, but in this action. You must have thought something about their relatedness.

**MR. DE BLANK:** Your Honor, I think it's been alluded to there's about 140, 160 patents in this family. We believe CardioCom infringes a large number of those patents.

If we were to try to file a case in the Northern District where we asserted 50 to 60 patents, we would either never see trial or simply -- I mean, it's an unmanageable, unwieldy amount.

We picked claims in first case that we can clearly rove CardioCom infringed, and we asserted those. When the case was stayed, we filed a second case because CardioCom's harm to us

had grown even --

(Reporter interruption)

**MR. DE BLANK:**  When the first case was stayed, we filed a second case, because CardioCom's harm to us had grown even larger than at the time of the first case.  And we picked a second set of patents.

**THE COURT:**  You picked out of the 145, the six.

**MR. DE BLANK:**  Correct, Your Honor.

**THE COURT:**  I assume you did so for some reason.

**MR. DE BLANK:**  It was a manageable number to assert in this case.  We could have picked five --

**THE COURT:**  Not the number; these patents.  You must have -- you didn't just throw a dart on the wall and close your eyes.

**MR. DE BLANK:**  I understand your question, Your Honor.  We picked these six patents because we thought that CardioCom clearly infringed.  And precisely because it gave us a range of different claims, different features, different aspects of the products that were accused.

We didn't pick these six patents because we thought they were similar.  We picked these six patents because they were different.  Because they go to different accused products, because they go to different features of those products.  And because across the six, it covers a wide variety of the harm that we are suffering.

**THE COURT:** So, products covered by the '605, which your opponent says is similar to the '420 are different products accused by the '605 as compared to the '420? Or is there overlap?

**MR. DE BLANK:** So the '605 and the '420 patent go to what's called a group overview chart, at a very high level. The accused product in that is a program from CardioCom called OMNIVISOR. OMNIVISOR has a variety of different features and different elements, and it does different things. Some of those features and elements and limitations would meet claims of the '420. Different features, different elements, different limitations would meet claims in the '605.

The '469 patent, the other infant patent where the claims are not subject to IPR, goes to an entirely different feature. This relates to the scripting elements that's embodied in CardioCom's COMMANDER, COMMANDER FLEX products, and a number of other devices. They are different patents with different claims, with different limitations, with different proof that we need to do to show infringement. And that -- that -- they're not overlapping.

If they had overlapped with the other claims subject to the IPR, presumably the patent office would come to a different conclusion, and would have found those subject to the IPR also. The fact that the patent office rejected the IPR petitions on those patents and those claims proves that

they are not overlapping with the other ones.

THE COURT:   All right.   Let me get your final comment on this, that these appear to be a different, even the related patents of the '605 and the '420 go to different features, different -- different claims are asserted against different features, even though it's one device.

MR. MCDONALD:   Right.   Okay.   So I'll put up here on the ELMO screen the '249.   That's one of the ones I believe that is not in IPR, so that's one of the ones you're asking about.   You know, what if we go forward with this one?

(Document displayed)

MR. MCDONALD:   And just kind of on the fly here I wanted to highlight a couple of phrases in the claims As read):

"Script generator for generating a script program..."

(Reporter interruption)

MR. MCDONALD:   (As read)

"Script generator for generating a script program."

And also, you see the words:

"A data merge program."

And that is the sort of language that's at issue in these IPR proceedings.   It's certainly going to be very relevant to infringement.

So, that's in this one.   What about the ones that are already in IPRs?   Are we going to be doing the same thing

again?

(Document displayed)

**MR. MCDONALD:**  '192 patent.

"The data merge program configured to generate a customized script program."

The same sort of limitations -- and these aren't just randomly selected, Your Honor.  We don't think we do script programs.  And we don't think we do data merge programs.

And we're going to say the exact same thing when we are talking about the '249 --

**THE COURT:**  Which, which patent is this from, that you're showing?

**MR. MCDONALD:**  Oh, I'm sorry.  The '192.

(Document displayed)

**MR. MCDONALD:**  That's one of the ones that's in the Institute of IPR as to all 37 claims, I believe.  So, we're going to be saying the exact same thing twice.

That's the '420 -- that's those patents.  For example, here's the '605.

(Document displayed)

**MR. MCDONALD:**  That's the one that is not an IPR.  There is a picture of the group overview chart.  They always put the representative figure on the front.

(Document displayed)

**MR. MCDONALD:**  Here's the one that is in IPR.  Gee,

are these the exact same thing?  Yes.

(Document displayed)

**MR. MCDONALD:**  Go to the claim language.  What's been at issue in the IPRs?  Do you have charts where each data point is including an icon?  That's one of the big issues in the IPR with the '420.  And it's going to continue to be a big issue.

(Document displayed)

**MR. MCDONALD:**  How about in the '605?  Oh, you've got a display unit with a group overview chart (Indicating), each data point including an icon (Indicating).

Going to be fighting over the exact same thing on these patents, too.

(Document taken off display)

**THE COURT:**  So the infringement case is going to overlap is what you're saying.  At the very least.

**MR. MCDONALD:**  Absolutely.  Absolutely.  And that's the exact same products being accused, you're going to come up with a royalty, and you're going to say, "Oh, the value is done due to this wonderful patent."

And then when we have the other lawsuit later, guess what?  That patent is going to all of a sudden become the world's most valuable patent for Bosch, and the other patent isn't going to be worth anything.  And they're going to play games with that, or at least have that opportunity, when they are

given a chance to split things up like this.

And so, it's going to have a direct impact on damages, and increase substantially the mischief level if we split these things up.

I'll make one other point about that.  They haven't proven anything about us infringing anything.  And I know we're not there, but when they are really making that big of a deal about the injunction, you'd think we would at least get a little smidgen about how one of these claims that they tink is going to survive the IPR is something we actually practice.  And, we just don't.

THE COURT:  All right.  I'm going to take the matter under submission.

MR. DE BLANK:  Your Honor, can I make just one point?

THE COURT:  One point.

MR. DE BLANK:  And respond directly to what Mr. McDonald said?

THE COURT:  One point.

(Reporter interruption)

MR. DE BLANK:  He showed you the '249 --

(Reporter interruption)

MR. DE BLANK:  I apologize.

He showed you the '249 and the '192 patent.  He pointed to two or three words of the claim, for example, "Script program," and said, "Look, these are similar."

CardioCom has proposed different constructions for that term, "Script program," in the '249 and the '192 IPRs. CardioCom has taken the position they mean different things between those two patents.  And he hasn't even addressed all the other differences in the claims.

That's the only point I wanted to make, Your Honor.  Thank you for the opportunity.

THE COURT:  All right.  I'll take the matter under submission.  Do we have a --

THE CLERK:  We do have a CMC on July 10th at 9:30.

THE COURT:  We'll leave that in place at this point, until I rule on this.

Thank you.

MR. DE BLANK:  Thank you, Your Honor.

(Conclusion of Proceedings)

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball

Friday, July 25, 2014

Belle Ball, CSR 8785, CRR, RDR